752 P.2d 28

Lowell V. BURNS, Gloria A. Lloyd, Georgina A. Burns, Vernon P. Burrington, Ryan Cothrun, Ronald K. Cothrun, William E. Crawford, Deloys M. Crawford, Jeffrey R. Crawford, Robert L. Dobbs, Gloria O. Dobbs, Robert L. Dobbs, II, Daniel L. Dobbs, Margo L. Drake, Rose M. Giorza, Geno Giorza, Maury S. Gooch, Carroll E. Hounshell, Carolyn G. Hounshell, Cathy J. Hounshell, Roy M. Hudson, Ruth E. Hudson, Thomas B. Hunt, Cytha L. Hunt, Crystal N. Hunt, Brandon T. Hunt, Kim I. Hutchinson, Elaine F. Insalaco, Stephanie L. Joy, Lilalee M. McClellan, Tamiko McClellan, Patrick W. McClellan, Toni M. McClellan, Steven D. McDonald, Nicole L. McDonald, Barbara J. Pearson, Vicky J. Preston, Nicole D. Preston, James M. Richards, Shannon Richards, David J. Vasbinder, Debra A. Vasbinder, Molly A. Vasbinder, Christine S. Christian, Gerald W. Fisher, Penelope A. Fisher, Gerald W. Fisher, II, Joseph I. Giorza, II, F. Arlene Hutchinson, Donald E. Vasbinder, Irene Burrington, Robert B. Denk, Audrey I. Denk, Gary R. Drake, Gary H. Drake, Louis A. Giorza, Dorothy O. Gooch, James S. Ianello, Janet N. Ianello, Anthony C. Insalaco, Salvatore M. Insalaco, Anna D. Insalaco, Gary P. McDonald, Karen K. McDonald, Grady M. Towerton, Verda M. Towerton, Charlene A. Vasbinder, Eunice M. West, John T. West, Dawn M. Winter (Drake), Raymond W. Luckie, Sarah Luckie, Kelly Luckie, Holly R. Luckie, Hiddie B. Pyle, Katherine A. Scott, Shawn H. Scott, Stacy A. Scott, Orval B. Williams, Lanora B. Williams, Melanie Williams, Lori Williams, Jason Williams, Ralph Ycedo, Jr., Albina Ycedo, and Michael E. Ycedo, Plaintiffs/Appellants,

v.

JAQUAYS MINING CORPORATION, D.W. Jaquays Mining and Contractors Equipment Co., D.W. Jaquays and Evelyn Jaquays, Gila County, Pinal–Gila Counties Air Quality Control District, City of Globe, State of Arizona, Mr. and Mrs. Rex Town, Neal Beaver and Mr. and Mrs. Larry M. Schwartz, Defendants/Appellees.

No. 2 CA–CV 5970.

Court of Appeals of Arizona, Division 2, Department A.

Dec. 10, 1987.

As Corrected Dec. 22, 1987.

As Amended Jan. 15, 1988.

Petition for Review Granted in part and Denied in part April 26, 1988.

Cross–Petition for Review Denied April 26, 1988.

Harrison & Lerch, P.C. by Mark I. Harrison, Douglas L. Christian and Mary E. Berkheiser, Phoenix, Sparks & Siler, P.C. by Joe P. Sparks and Kevin T. Tehan, Scottsdale, Henderson & Goldberg by Thomas W. Henderson and Robert Jennings, Pittsburgh, for plaintiffs/appellants.

Robbins & Green, P.A. by William H. Sandweg III, Jill H. Grossman and William P. Hovell, Phoenix, for defendants/appellees.

John H. Ryley, Sp. Asst. Atty. Gen., Phoenix, co-counsel for defendant/appellee State of Arizona.

Burch & Cracchiolo, P.A. by Brian Kaven, Daniel R. Malinski, Phoenix, for defendants/appellees Gila County and Pinal–Gila Counties Air Quality Control Dist.

Leonard Everett by Leonard Everett, Tucson, for defendant/appellee City of Globe.

Gallagher & Kennedy by W. Charles Thomson, Thomas A. Maraz, Phoenix, co-counsel for defendant/appellee Schwartz.

Crampton, Woods, Broening & Oberg by Mary B. Wilson, James R. Broening, Phoenix, for defendant/appellee Beaver.

Marc Cavness, Phoenix, co-counsel for defendant/appellee City of Globe.

Hill & Savoy by George Hill, Phoenix, for defendants/appellees Town.

## OPINION

HOWARD, Presiding Judge.

This is an appeal from the granting of a summary judgment.[1] The main issue in this case is whether subclinical asbestos-related injury is sufficient to constitute the actual loss or damage required to support a cause of action. We hold that it is not.

Jaquays owned land in Gila County upon which it operated an asbestos mill and had a tailings pile. In 1973, the City of Globe approved the creation of a mobile home subdivision, Mountain View Mobile Home Estates, on adjacent land. The plaintiffs were all at one time residents of the trailer park. Asbestos fiber was blown from the mill and tailings pile into the trailer park. In 1979, the plaintiffs learned the asbestos was dangerous and life threatening. In December 1979, the governor declared the trailer park a disaster area. Steps were taken to clean up the contamination and, in 1983, the state began to relocate the residents who stayed on the premises. It was not until September 16, 1985, that the asbestos hazard was finally contained.

▮ The first lawsuits were filed in 1980 and 1981. Other suits were filed in 1982

---

1. The defendants who were awarded the summary judgment are Jaquays Mining Corporation, D.W. Jaquays Mining and Contractors Equipment Co., D.W. Jaquays and Ethelyn (sic) Jaquays (hereinafter referred to collectively as "Jaquays"), Mr. and Mrs. Larry M. Schwartz, Gila County, Pinal–Gila Counties Air Quality Control District, City of Globe, State of Arizona, Mr. and Mrs. Rex Town and Neal Beaver.

and 1983.[2] Plaintiffs seek damages for personal injuries and property damage based on negligence, gross negligence, strict liability and nuisance. They also claim damages for the increased risk of developing cancer or other asbestos-related diseases, the need for life-long medical surveillance to monitor the development of those diseases and emotional distress caused by the knowledge and fear of these impending developments. The trial court granted summary judgment on all counts except the count for damages to property.

We view the facts in the light most favorable to the plaintiffs. *Gulf Insurance Co. v. Grisham,* 126 Ariz. 123, 613 P.2d 283 (1980). According to the plaintiffs' expert witnesses, the residents of the trailer park were exposed to substantial and cumulative quantities of asbestos fiber. Their cumulative exposure was comparable to and greater than the exposure experienced by workers in asbestos mines, milling and manufacturing industries. They all have asbestos fibers in their lungs which are causing changes in the lung tissue. Sooner or later some of the residents, if they live long enough, will suffer from asbestosis and other asbestos-related diseases. Some of the children who have been exposed will die of asbestos-related diseases and some will become seriously handicapped.

It is clear from the record that none of the plaintiffs has been diagnosed as having asbestosis. Some of the plaintiffs claim to be suffering from mental anguish as a result of their exposure to asbestos, but there is no competent evidence of any physical impairment or harm caused by this exposure. "The threat of future harm, not yet realized, is not enough." Prosser and Keeton on the Law of Torts § 30 at 165 (5th ed. 1984). See also, *DeBoer v. Brown,* 138 Ariz. 168, 673 P.2d 912 (1983); *Alhino v. Starr,* 112 Cal.App.3d 158, 169 Cal.Rptr. 136 (1980); *Johnson v. Rouchleau–Ray Iron Land Co.,* 140 Minn. 289, 168 N.W. 1 (1918). We believe the following quote from *Schweitzer v. Consolidated Rail Corp. (Conrail),* 758 F.2d 936, 942 (3rd Cir.1985), cert. denied, 474 U.S. 864, 106

S.Ct. 183, 88 L.Ed.2d 152, is applicable here:

"It is true that the possible existence of subclinical asbestos-related injury prior to manifestation may be of interest to a histologist. [citations omitted.] Likewise, the existence of such injury may be of vital concern to insurers and their insureds who have bargained for liability coverage triggered by 'bodily injury.' [citation omitted.] We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.

Moreover, we are persuaded that a contrary rule would be undesirable as applied in the asbestos-related tort context. If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do. Requiring manifest injury as a necessary element of an asbestos-related tort action avoids these problems and best serves the underlying purpose of tort law: the compensation of victims who have suffered. Therefore we hold that, as a matter of federal law, F.E.L.A. actions for asbestos-related injury do not exist before manifestation of injury."

The reasoning in *Schweitzer* was approved in *Jackson v. Johns–Manville Sales Corp. (Jackson III),* 781 F.2d 394, 412 n. 22 (5th Cir.1986), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743. See also *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (cause of action for silicosis accrues when the disease manifests itself); *Clutter v. Johns-Manville Sales Corp.,* 646 F.2d 1151 (6th Cir.1981) (a cause of action under Ohio law for asbestosis accrues when the disease manifests it-

2. Fifty-six plaintiffs remain in this case.

self); *Bendix Corp. v. Stagg*, 486 A.2d 1150 (Del.1984) (statute of limitations for injuries arising from inhalation of asbestos fiber began to run when harmful effect of asbestosis first manifested itself and became physically ascertainable, and not at time of exposure or time scar tissue began to form).

Arizona follows the "discovery rule" as far as the statute of limitations for personal injuries is concerned. See *Mack v. A.H. Robins Co., Inc.*, 573 F.Supp. 149 (D.C. 1983); *DeBoer v. Brown, supra.* See also A.R.S. § 12–542(1). The statute of limitations does not begin to run until there is a manifestation of disease or physical injury. The purpose of the discovery rule, in the context of a latent disease, is to protect a plaintiff who, through no fault of his own, discovers only belatedly that he has the disease. Allowing plaintiffs to sue for injuries when the disease is still subclinical would be an abrogation of the discovery rule in asbestos cases and mandate the commencement of a suit as soon as the contact with the asbestos fiber occurs, hardly a desirable result.

We agree with the observations made by the court in *Schweitzer v. Consolidated Rail Corp. (Conrail), supra.* Justice would not be done either to the plaintiffs or the defendants by allowing a suit prior to manifestation of any physical injuries or disease. In addition to the reasons given by the federal court, we also note that until the asbestosis manifests itself one can only speculate as to the debilitating effects the plaintiff will suffer. Not all asbestosis is one hundred percent debilitating.[3] We see no reason to depart from traditional tort concepts and allow recovery for injuries before any disease becomes manifest.[4] The statute of limitations does not begin to run until there is a manifestation of physical injuries or disease.

■■■ In order to overcome the lack of manifestation of any asbestos-related diseases and to supply the necessary physical

harm required for a claim of damages for enhanced risk of cancer and emotional distress, the plaintiffs point to the affidavit of one of their experts, Dr. Michael Gray, who did not conduct a physical examination of all the residents. He states that many of the residents have suffered severe and clinically significant mental distress as a consequence of the asbestos situation. He did not specifically identify any of the plaintiffs as being in this class. He also stated that the emotional distress manifested itself "in a variety of disorders affecting normal sleep patterns, normal gastrointestinal functions, alterations in the ability to cope with other life stress, manifestations of anger, headaches, personality disorders, sexual dysfunction, and other adverse health effects which in no fashion could be termed trivial, insignificant, or of only minor or temporary inconvenience for these people." In addition to the fact that the affidavit fails to link any of the plaintiffs with these so-called physical manifestations, there is another reason why plaintiffs' claims for enhanced risk of cancer and for emotional distress are insufficient. There can be no claim for damages for the fear of contracting asbestos-related diseases in the future without the manifestation of a bodily injury. See *Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668 (1979); see also *Adams v. Johns–Manville Sales Corp.*, 783 F.2d 589 (5th Cir.1986); *Nutt v. A.C. & S., Inc.*, 466 A.2d 18 (Del.Super.Ct. 1983), aff'd, 480 A.2d 647 (Del.1984). We agree with the New Jersey Supreme Court in *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287 (1987), that neither the single controversy rule, nor the statute of limitations will preclude a timely filed cause of action for damages prompted by the future discovery of a disease or injury related to the exposure to a toxic substance, even though there has been prior litigation between the parties on different claims based on the same tortious conduct.

---

3. The plaintiff in *Jackson v. Johns–Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984) was first diagnosed as having a 15 percent pulmonary disability which had not progressed significantly by the time of trial.

4. Division One of this court reached the same conclusion in *DeStories v. City of Phoenix*, 154 Ariz. 604, 744 P.2d 705 (Ct.App.1987.)

The psychosomatic injuries diagnosed by Dr. Gray consist of headaches, acid indigestion, weeping, muscle spasms, depression and insomnia. There is no evidence that these were other than transitory physical phenomena. They were not linked to any specific plaintiff, and they are not the type of bodily harm which would sustain a cause of action for emotional distress. Comment *c* to the Restatement (Second) of Torts § 436(A) (1965) is applicable here:

"The rule [preventing recovery for emotional disturbance alone] applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, non-recurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character...."

■ The complaints in this case also alleged a private and public nuisance as follows:

"As a direct and proximate result of the continued maintenance of a nuisance on said property Plaintiffs were caused to become sick, ill and disabled and were prevented from attending to their usual duties and occupation and were compelled to secure medical care and attention in an effort to heal and/or alleviate said injuries and illnesses and will, in the future, be continuously exposed to risk of grave illnesses and harm and may be compelled to secure additional medical care and attention in an effort to heal their said injuries, to their damage. As a further direct and proximate result of the exposure to carcinogenic asbestos the plaintiffs have incurred psychological and emotional trauma and distress."

Restatement (Second) of Torts § 929 sets forth the damages one can recover as a result of a nuisance:

"(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant."

The Comment on Subsection (1), Clause (*c*) states:

"(*e*) *Discomfort and other bodily and mental harms.* Discomfort and annoyance to an occupant of the land and to the members of the household are distinct grounds of compensation for which in ordinary cases the person in possession is allowed to recover in addition to the harm to his proprietary interests. He is also allowed to recover for his own serious sickness or other substantial bodily harm but is not allowed to recover for serious harm to other members of the household, except so far as he maintains an action as a spouse or parent, under the rules stated in §§ 693 and 703. The owner of land who is not an occupant is not entitled to recover for these harms except as they may have affected the rental value of his land."

Those damages that are recoverable are those for the disruption and inconvenience resulting from, in this case, the contamination by asbestos. See *Ayers v. Township of Jackson,* supra. While some of the damages prayed for in plaintiffs' nuisance counts are not recoverable, the counts do set forth a claim for damages for inconvenience, discomfort and annoyance and for property damage, all of which is within the permissible ambit of § 929 of the Restatement. We conclude that the trial court erred in dismissing the nuisance counts.

The last issue is the plaintiffs' claim for recovery of damages to institute a medical surveillance. Dr. Gray testified that as of 1981, all of the adults of ages 65 or under are at greatly advanced risk of asbestos-related lung cancers, mesothelioma, gastrointestinal cancers and asbestosis. Some of the children will die from these diseases and some will become severely handicapped. Dr. Gray also testified that because of the risk, all of the residents should be provided with present and future medical surveillance in order to minimize, detect and treat the diseases as they arise. He described the type of surveillance that should be available, which included physical exams, blood and urine laboratory work-up, electro-cardiograms, periodic chest x-rays, CT scanning techniques and/or magnetic resonance imaging and pulmonary function testing. For individuals over 40 years of age and/or individuals who are 20 years from their initial exposures to asbestos, periodic rectal examinations and gastrointestinal consultation was required as well as additional testing when respiratory disease was apparent. He believed that the frequency of the medical surveillance would, in substantial measure, be influenced by the nature and prevalence of various asbestos-related abnormalities detected on the population as a whole and in each individual. He recommended that the testing be conducted approximately every other year, with the frequency increased as time progresses because the probability of asbestos-related disease increases directly as a latency period increases. He suggested that radiologic chest assessments, if utilized, should occur approximately every five years.

We believe, under the facts of this case and despite the absence of physical manifestation of any asbestos-related diseases, that the plaintiffs should be entitled to such regular medical testing and evaluation as is reasonably necessary and consistent with contemporary scientific principles applied by physicians experienced in the diagnosis and treatment of these types of injuries. We agree with the court in *Ayers v. Township of Jackson,* supra 525 A.2d at 312, that when the evidence shows "through reliable expert testimony predicated on the significance and extent of exposure ... the toxicity of [the contaminant], the seriousness of the diseases for which the individuals are at risk, the relative increase in the chance of onset of the disease in those exposed and the value of early diagnosis, ... surveillance to monitor the effects of exposure to toxic chemicals is reasonable and necessary," and its cost is a compensable item of damages. As the New Jersey Supreme Court said at 525 A.2d 311:

"Compensation for reasonable and necessary medical expenses is consistent with well accepted legal principles. [citation omitted.] It is also consistent with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease. The value of early diagnosis and treatment for cancer patients is well documented. [citation omitted.]"

The New Jersey court gave another cogent reason for its ruling:

"Recognition of pre-symptom claims for medical surveillance serves other important public interests. The difficulty of proving causation, where the disease is manifested years after exposure, has caused many commentators to suggest that tort law has no capacity to deter polluters, because the costs of proper disposal are often viewed by polluters as exceeding the risk of tort liability. [citations omitted.] However, permitting recovery for reasonable pre-symptom, medical-surveillance expenses subjects polluters to significant liability when proof of the causal connection between the tortious conduct and the plaintiffs' exposure to chemicals is likely to be most readily available. The availability of a substantial remedy before the consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illnesses and thus reduce the overall costs of the responsible parties. Other considerations compel recognition of a pre-symptom medical surveillance

claim. It is inequitable for any individual, wrongfully exposed to dangerous toxic chemicals but unable to prove that disease is likely, to have to pay his own expenses when medical intervention is clearly reasonable and necessary."

The next question is whether the plaintiffs are entitled to a lump sum award for this medical surveillance or whether a court-supervised fund should be utilized. We believe that the latter approach is proper. As the court said in *Ayers,* 525 A.2d at 314:

"In our view, the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases, ... is a highly appropriate exercise of the Court's equitable powers. [citation omitted.] ... Such a mechanism offers significant advantages over a lump-sum verdict....

In addition, a fund would serve to limit the liability of defendants to the amount of expenses actually incurred. A lump-sum verdict attempts to estimate future expenses, but cannot predict the amounts that actually will be expended for medical purposes. Although conventional damage awards do not restrict plaintiffs in the use of money paid as compensatory damages, mass-exposure toxic-tort cases involve public interests not present in conventional tort litigation. The public health interest is served by a fund mechanism that encourages regular medical monitoring for victims of toxic exposure. Where public entities are defendants, a limitation of liability to amounts actually expended for medical surveillance tends to reduce insurance costs and taxes,....

Although there may be administrative and procedural questions in the establishment and operation of such a fund, we encourage its use by trial courts in managing mass-exposure cases. In litigation involving public-entity defendants, we conclude that the use of a fund to administer medical-surveillance payments should be the general rule, in the absence of factors that render it impractical or inappropriate. [footnote omitted.] This will insure that in future mass-expo-sure litigation against public entities, medical-surveillance damages will be paid only to compensate for medical examinations and tests actually administered, and will encourage plaintiffs to safeguard their health by not allowing them the option of spending the money for other purposes...."

The judgment below is reversed as to plaintiffs' claims for damages based on nuisance and for medical surveillance, and it is affirmed in all other respects.