Tom HANSEN, an individual; Douglas A. Hilton, an individual; Mike MacKintosh, an individual; Bruce Silcox, an individual; and Russell Vickers, an individual, Plaintiffs and Appellants,

v.

MOUNTAIN FUEL SUPPLY COMPANY, a Utah corporation; Roger Barrus, an individual; Roger Morse, an individual; and John Does I through XXV, Defendants and Appellees.

MOUNTAIN FUEL SUPPLY COMPANY; Roger Barrus, an individual; and Roger Morse, an individual, Third–Party Plaintiffs,

v.

CCI MECHANICAL, INC., a Utah corporation (formerly known as Climate Control, Inc.), Third–Party Defendant.

No. 900420.

Supreme Court of Utah.

Aug. 4, 1993.

James E. Morton, Ronald C. Wolthuis, Salt Lake City, for plaintiffs.

Spencer E. Austin, Gordon L. Roberts, William J. Evans, Ray G. Groussman, Charles E. Greenhawt, Salt Lake City, for defendants.

DURHAM, Justice:

Plaintiffs were exposed to asbestos while performing renovation work for Mountain Fuel. They appeal from an order of summary judgment on their claims for personal injury, negligent infliction of emotional distress, and the costs of medical monitoring granted on the ground that plaintiffs have not suffered bodily injury. We reverse the order regarding the claims for medical monitoring but affirm the rulings on personal injury and negligent infliction of emotional distress.

In reviewing a summary judgment, we consider the facts in the light most favorable to the nonmoving party. We affirm only when there is no material issue of disputed fact and the moving party is entitled to judgment as a matter of law. *D & L Supply v. Saurini*, 775 P.2d 420, 421 (Utah 1989). Further, because a challenge to a summary judgment presents only issues of law, we give no deference to the trial court's conclusions; instead, we review those conclusions for correctness. *Bonham v. Morgan*, 788 P.2d 497, 499 (Utah 1990) (per curiam).

Plaintiffs Hansen, Hilton, MacKintosh, Silcox, and Vickers were employees of CCI Mechanical, Inc. ("CCI"). CCI had contracted with Mountain Fuel to do renovation work in the basement of Mountain Fuel's downtown Salt Lake City office. The project included rerouting asbestos-insulated piping and equipment. As part of the project, brick insulation was removed from a breach in the basement area and piled nearby; it was later moved and stacked in an adjacent walkway. Sometime in August 1986, plaintiffs expressed concern about the composition of the insulation. A Mountain Fuel representative told the CCI foreman that the insulation was not asbestos, that all the asbestos in the area had been removed seven years earlier, and that it was a harmless substance, calcium silicate. During plaintiffs' work, the insulation was crushed and

tracked through the work site.[1] Because of some ventilation problems, the particles became airborne and the workers had to take periodic breaks to clean the dust from their noses and mouths. In November 1986, Vickers again expressed concern to defendant Roger Barrus, the safety director for Mountain Fuel, that the insulation might be asbestos. Barrus had the material tested and learned that it was 60–65 percent amosite asbestos and less than 1 percent crysotile asbestos. Mountain Fuel subsequently had the asbestos removed from the project.

Plaintiffs allege that they experienced coughing, wheezing, shortness of breath, chest tightness, headaches, and severe eye irritation as a result of their exposure. They also claim that they suffered anxiety and sleeplessness stemming from their fear of contracting serious diseases as a result of their exposure to asbestos. None of them currently suffer from any asbestos-related disease. Aside from initial examinations that revealed no illness that could be traced to their exposure, plaintiffs have had no further medical examinations, nor have they incurred any medical expenses or claimed lost wages or income as a result of their exposure.

## I. CURRENT INJURY

■ Plaintiffs first contend that their exposure to asbestos resulted in "severe coughing, respiratory distress, chest tightness, headaches, severe eye irritations and nausea" and that they should be compensated for those injuries.[2] They have not presented sufficient evidence, however, to show that these symptoms were caused by their exposure at Mountain Fuel. In 1987, Hansen, Hilton, Silcox, and Vickers were examined by Dr. Battigelli at the Occupational Clinic for the Department of Family

and Preventive Medicine at the University of Utah. After the examination, Dr. Battigelli concluded that plaintiffs' exposure was "limited and perhaps inconsequential" and that "[n]one of these individuals presented at our examination evidence of respiratory disorders which could be meaningfully related to that specific exposure." We have found no other evidence in the record regarding any illness or symptoms suffered by MacKintosh. Thus we have nothing more than plaintiffs' bare allegations to support their claims of harm. Such allegations are insufficient to withstand summary judgment. *See Thornock v. Cook,* 604 P.2d 934, 936 (Utah 1979).

Plaintiffs may, of course, bring another action if and when they do develop a serious disease as a result of their exposure. Defendants have conceded that pursuant to the discovery rule, the statute of limitations would not bar such a future claim.

## II. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS [3]

Defendants contend that plaintiffs cannot recover for negligent infliction of emotional distress ("NIED") because they have not demonstrated that their emotional distress resulted in illness or bodily harm. We have never squarely considered whether a plaintiff seeking recovery for NIED must demonstrate that the emotional distress has manifested itself in physical symptoms.

In *Johnson v. Rogers,* 763 P.2d 771 (Utah 1988), we first recognized an action for negligent infliction of emotional distress. In *Johnson,* the plaintiff and his eight-year-old son were waiting at a crosswalk when a truck jumped the curb, injuring the plaintiff and killing his son. The plaintiff

---

**1.** Apparently, none of the plaintiffs participated in the actual removal of the insulation.

**2.** Although some courts have recognized that significant exposure, standing alone, is a sufficient injury to maintain a claim for enhanced risk of future disease, *see, e.g., Gideon v. Johns–Manville Sales Corp.,* 761 F.2d 1129, 1137 (5th Cir.1985), plaintiffs have specifically conceded that they are not pursuing a claim under this

theory. *But see Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287, 304–08 (1987) (declining to recognize cause of action for unquantified enhanced risk of disease). Therefore, we do not address the merits of such an action.

**3.** The discussion in this section does not represent the views of a majority of the court. See Justice Zimmerman's opinion concurring in part and concurring in the result.

claimed damages for the emotional distress suffered as a result of the incident. This court sustained the plaintiff's cause of action and adopted the approach set forth in section 313(2) of the Second Restatement of Torts (the "zone of danger" rule) for determining liability for the negligent infliction of emotional distress. *Johnson*, 763 P.2d at 785. Section 313 provides:

> (1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
>
> (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
>
> (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.
>
> (2) The rule stated in subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.

Restatement (Second) of Torts § 313 (1965). In *Johnson*, we were primarily concerned with the application of the rule outlined in subsection (2). In the instant case, plaintiffs are not seeking recovery for trauma inflicted on them because of harm or peril to one nearby; plaintiffs allege that they themselves inhaled asbestos.[4] *See Johnson*, 763 P.2d at 781–82 (opinion of Durham, J.) (discussing distinction between bystander and direct-victim NIED). Thus subsection (1), rather than subsection (2), applies to this case. Subsection (1) provides liability only for "resulting illness or

bodily harm." Defendants contend that plaintiffs do not meet this requirement.

Most courts require some sort of injury or physical manifestation of distress as a prerequisite to recovery for NIED. *See, e.g., Keck v. Jackson*, 122 Ariz. 114, 593 P.2d 668, 669 (1979); *Brown v. Cadillac Motor Car Div.*, 468 So.2d 903, 904 (Fla. 1985); *Brown v. Matthews Mortuary, Inc.*, 801 P.2d 37, 42 (Idaho 1990); *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 178–80 (Mass.1982); *Thorpe v. Department of Corrections*, 133 N.H. 299, 575 A.2d 351, 353 (1990). Such a requirement provides a check on feigned disturbances, thereby ensuring the genuineness of claims. Moreover, emotional disturbance that is not severe enough to result in illness or physical consequences is likely to be in the realm of the trivial. Such a disturbance is likely to be so temporary and subjective that to attempt to compensate it would unduly burden defendants and the courts. *See* Restatement (Second) of Torts § 436A cmt. b (1965); *Payton*, 437 N.E.2d at 178–79 (citing the Restatement).

Although many courts agree that a plaintiff must establish some accompanying physical manifestation in order to recover for NIED, they differ widely regarding the nature of evidence sufficient to establish such harm. *See, e.g., DeStories v. City of Phoenix*, 154 Ariz. 604, 744 P.2d 705, 710 (Ct.App.1987) (defining standard for injury as "physical harm or medically identifiable effect"); *Cathcart v. Keene Indus. Insulation*, 324 Pa.Super. 123, 471 A.2d 493, 508 (1984) (same); *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431, 434 (Tenn. 1982) (recognizing ingestion of frightening or noxious substance as sufficient physical injury). The language used in section 313 of the Restatement provides some guidance. Subsection (1) allows recovery for "illness *or* bodily harm." Restatement (Second) of Torts § 313(1) (1965) (emphasis

---

**4.** In some cases, a plaintiff may be eligible to recover for NIED although no one in the case was subject to bodily harm. *See Hanke v. Global Van Lines, Inc.*, 533 F.2d 396, 400 (8th Cir. 1976) (moving company that delayed delivery of plaintiffs' goods for 100 days after repeatedly assuring her that delivery was imminent could be subject to NIED action). In that event, a foreseeability test as outlined in subsection (1) of section 313 would be appropriate to evaluate liability. The plaintiffs in the instant case, however, were exposed to bodily injury. I would leave to a future case the parameters of a pure foreseeability test, but I note that such a test is appropriate under subsection (1).

added). The drafters' use of "or" rather than "and" shows an intention to allow a plaintiff to recover not only where bodily harm results from emotional trauma, but where "illness" results as well. "Illness" is "an unhealthy condition of body or mind." *Webster's New Collegiate Dictionary* 566 (1981). From this we conclude that either physical or mental illness may support the NIED cause of action.

A rule allowing recovery for mental illness as well as physical injury serves a major purpose of the injury requirement—ensuring genuineness of claims. Given recent medical advances in the fields of psychiatry and psychology, it is now possible to establish emotional illness [5] with some degree of certainty. *See* Terry M. Dworkin, *Fear of Disease and Delayed Manifestation Injuries: A Solution or a Pandora's Box?* 53 Fordham L.Rev. 527, 532–33 (1984). A plaintiff who can establish through appropriate expert testimony that he or she suffers from mental illness as a result of a defendant's negligent conduct may maintain an action for NIED.

We emphasize, however, that the emotional distress suffered must be severe; it must be such that "a reasonable [person,] normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509, 520 (1970); *see also Molien v. Kaiser Found. Hosp.*, 27 Cal.3d 916, 167 Cal.Rptr. 831, 836–39, 616 P.2d 813, 818–21 (Cal.1980). Further, in cases such as this, which deal with emotional distress resulting from fear of developing a disease in the future, the fact finder should also consider the likelihood that the disease will actually occur in determining the reasonableness of the fear. *Potter v. Firestone Tire & Rubber Co.*, 15 Cal.App. 4th 490, 274 Cal.Rptr. 885, 893 (Ct.App.1990). The fact finder should further consider the duration and nature of the exposure to the toxic substance. Such requirements will ensure that defendants and the courts face only cases involving serious emotional distress. Given that almost everyone is exposed from time to time to toxic substances in one form or another, it is important that only those who have had significant exposure leading to serious emotional distress recover for NIED.

The plaintiffs in the instant case fail to meet the above standards as a matter of law. They allege only that they suffered transitory anxiety and sleeplessness as a result of their exposure to asbestos. Such symptoms do not constitute illness or injury within the meaning of section 313(1). Everyone must deal with stress and anxiety in daily life; most of us experience occasional sleeplessness. Transitory sleeplessness and anxiety do not amount to the type of emotional distress with which a reasonable person, normally constituted, would be unable to cope. *See Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28, 32 (Ariz.Ct.App.1988) (headaches, depression, and insomnia are only "transitory physical phenomena" and are not the type of physical injury that would sustain the NIED action). Plaintiffs have not proffered any evidence indicating that their distress is sufficiently severe to constitute mental illness, nor do we have evidence that their distress has resulted in physical symptoms. Plaintiffs' mere unsubstantiated opinions that they have suffered severe anxiety as a result of their exposure do not create a triable issue of fact that would withstand summary judgment. Consequently, their claims for NIED fail.

## III. MEDICAL MONITORING

### A. Introduction

Plaintiffs also claim that they are entitled to medical monitoring damages as a result of their exposure to asbestos.[6] They

---

**5.** The Diagnostic and Statistical Manual of the American Psychiatric Association (DSM–III), which catalogues mental illnesses, is the most authoritative reference on the subject. It represents the current consensus of the professional community diagnosing mental illness.

**6.** To prevent confusion, we wish to point out that the claim for medical monitoring damages is separate and distinct from recovery for the enhanced risk of contracting a serious illness due to exposure. *See supra* note 2. For a thoughtful comparison of the two claims, see

contend that because they have been exposed, they must undergo periodic medical tests to facilitate early diagnosis and treatment of diseases stemming from their exposure. They contend that but for their exposure to asbestos, they would not be obligated to incur these additional medical expenses and that defendants are obligated to compensate them. Defendants counter that plaintiffs have proffered no medical evidence showing that they require anything more than routine health maintenance.

Plaintiffs' claim presents a question of first impression in Utah; however, many other jurisdictions have recognized the legitimacy of medical surveillance damages for toxic-tort plaintiffs.[7] Two common law principles underlie the theory of a plaintiff's right to recover medical monitoring expenses. Allan T. Slagel, Note, *Medical Surveillance Damages: A Solution to the Inadequate Compensation of Toxic Tort Victims*, 63 Ind.L.J. 849, 863–64 (1988) [hereinafter Slagel]. First, the doctrine of "avoidable consequences" mandates that the plaintiff submit to medically advisable treatment. Failure to do so may destroy the plaintiff's right to recover for a condition that he or she could have thereby avoided or alleviated. *See Hagerty v. L. & L. Marine Servs., Inc.*, 788 F.2d 315, 319 (5th Cir.), *modified on other grounds*, 797 F.2d 256 (5th Cir.1986). Second, the rule

allowing prospective medical damages supports a plaintiff's right to recover for reasonably anticipated medical expenses, including periodic diagnostic examinations: " 'A plaintiff ordinarily may recover reasonable medical expenses, past and future, which he incurs as a result of a demonstrated injury.' " *Id.* (quoting C. McCormick, *The Law of Damages* § 90 (1935)); *see also Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 310 (N.J.1987). Thus, medical surveillance damages promote early diagnosis and treatment of disease or illness resulting from exposure to toxic substances caused by a tort-feasor's negligence. *Ayers*, 525 A.2d at 311.

Allowing recovery for such expenses avoids the potential injustice of forcing an economically disadvantaged person to pay for expensive diagnostic examinations necessitated by another's negligence. Indeed, in many cases a person will not be able to afford such tests, and refusing to allow medical monitoring damages would in effect deny him or her access to potentially life-saving treatment. It also affords toxic-tort victims, for whom other sorts of recovery may prove difficult,[8] immediate compensation for medical monitoring needed as a result of exposure. Additionally, it furthers the deterrent function of the tort system by compelling those who expose others to toxic substances to minimize risks and costs of exposure. Slagel at 869. Al-

---

*Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 297–313 (1987).

While judicial recognition of the enhanced-risk cause of action has been infrequent, at least one commentator advocates the need for a growing acceptance of the claim and suggests that the trend has begun. *See generally* Kristen Chapin, Comment, *Toxic Torts, Public Health Data, and the Evolving Common Law: Compensation for Increased Risk of Future Injury*, 13 J. Energy Nat. Resources & Envtl. L. 129 (1993) [hereinafter Chapin].

7. For discussions of medical monitoring claims, see Allan T. Slagel, Note, *Medical Surveillance Damages: A Solution to the Inadequate Compensation of Toxic Tort Victims*, 63 Ind.L.J. 849 (1988) [hereinafter Slagel]; Leslie S. Gara, Comment, *Medical Surveillance Damages: Using Common Sense and the Common Law to Mitigate the Dangers Posed By Environmental Hazards*, 12 Harv.Entl.L.Rev. 265 (1988).

8. Other forms of recovery are often unattainable for persons exposed to toxic substances, largely because the physical injury resulting from the exposure usually does not emerge for many years. If a plaintiff sues immediately after exposure, he or she faces the nearly insurmountable task of proving the exact nature and extent of the injury suffered and the certainty of developing the feared disease in the distant future. Conversely, a plaintiff who waits until disease develops bears the burden of demonstrating that exposure many years earlier caused the illness. Further, even if the plaintiff can establish causation, the responsible parties may be difficult to locate or bankrupt by the time the illness develops. The defendant may also claim that a statute of limitations or repose bars the plaintiff's action. Consequently, toxic-tort plaintiffs face significant obstacles to recovery. *See generally* Slagel at 852–56; Chapin at 129–33 (describing the barriers to recovery toxic-tort victims face under traditional tort rules).

lowing such recovery is also in harmony with "the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease." *Ayers*, 525 A.2d at 311.

Despite these policy arguments, some contend that medical monitoring should be allowed only for those able to show actual, present, physical injury. Because of the latent nature of most diseases resulting from exposure to toxic substances, however, most toxic-tort plaintiffs cannot establish an immediate physical injury of the type contemplated in traditional tort actions. Slagel at 859–60; Kristen Chapin, Comment, *Toxic Torts, Public Health Data, and the Evolving Common Law: Compensation for Increased Risk of Future Injury*, 13 J. Energy Nat. Resources & Envtl. L. 129, 134 (1993) [hereinafter Chapin]. Instead, the physical injury resulting from exposure to toxic substances usually manifests itself years after exposure. Although the physical manifestations of an injury may not appear for years, the reality is that many of those exposed have suffered some legal detriment; the exposure itself and the concomitant need for medical testing constitute the injury. *See, e.g., Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 826 (D.C.Cir.1984) ("It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury."); Slagel at 864–65. This conclusion is consistent with the definition of "injury" in the Restatement of Torts. *Friends*, 746 F.2d at 826 (discussing Restatement (Second) of Torts § 7).

Courts have recognized that claims for medical monitoring implicate injuries or detriments warranting recovery. For example, in *Miranda v. Shell Oil Co.*, 12 Cal.App. 4th 28, 15 Cal.Rptr.2d 569, 574 (Ct.App.1993),[9] the California Court of Appeal construed the term "detriment" in its

damages statute as including a "demonstrated need to undergo future medical monitoring as a result of exposure to toxins." The court analogized a toxic-tort victim to an automobile-accident victim who suffers no visible injury but undergoes medically necessary testing to diagnose potential internal injuries. Just as that plaintiff is entitled to recover costs, so is the toxic-tort victim: "The outcome should be the same when the operative incident is toxic exposure rather than collision and the potential future harm is disease rather than physical impairment." *Id.* at 572 (citation omitted).

The United States Court of Appeals for the District of Columbia applied similar reasoning to a cause of action for medical monitoring in *Friends*, 746 F.2d at 816–38. *Friends* involved the crash of an airplane carrying orphans leaving Vietnam during the 1975 evacuation. The complaint alleged that the decompression and impact of the crash caused 149 surviving children to suffer minimal brain dysfunction, a neurological brain disorder. Because of delays in the trial, the court invited motions for summary judgment on the defendants' liability for diagnostic examinations and medical treatment. After considering the motions, the trial court ordered Lockheed to create a fund to pay for diagnostic examinations. The court of appeals affirmed, holding that a reasonable need for medical examinations is compensable, even absent proof of other injury. The court stated:

> To aid our analysis of whether tort law should encompass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:
>
> Jones is knocked down by a motorbike which Smith is riding through a red

---

**9.** The California Supreme Court has recently granted review of the *Miranda* decision. *Miranda v. Shell Oil Co.*, 17 Cal.Rptr.2d 608, 847 P.2d 574 (1993). Under California law, the opinion of the Court of Appeal is superseded by the grant of review and consequently has no precedential value in California. However, we remain persuaded by its reasoning and adopt it to the extent noted above.

light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action. A cause of action allowing recovery for the expense of diagnostic examinations recommended by competent physicians will, in theory, deter misconduct, whether it be negligent motorbike riding or negligent aircraft manufacture. The cause of action also accords with commonly shared intuitions of normative justice which underlie the common law of tort. The motorbike rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services—a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life. Under these principles of tort law, the motorbiker should pay.

*Friends*, 746 F.2d at 825.

We agree with the analyses in *Friends* and *Miranda* and apply them to both initial diagnostic examinations and recurring medical monitoring. A plaintiff forced to incur the cost of medical monitoring as a result of a defendant's negligent conduct should be entitled to compensation for those expenses. Mere exposure to an allegedly harmful substance, however, is not enough for recovery. Courts have set forth several criteria for determining whether a plaintiff is entitled to recover the costs of medical monitoring. Such criteria prevent unnecessary litigation and unwarranted recoveries. By imposing these requirements on plaintiffs, courts seek to ensure that only those plaintiffs who need monitoring above and beyond basic medical care will

recover costs. *Miranda*, 15 Cal.Rptr.2d at 574. We will examine some of the approaches used and then outline the criteria necessary to maintain a cause of action for medical monitoring in Utah.

### B. Other Jurisdictions

The New Jersey Supreme Court considered a medical monitoring claim in *Ayers*, where the plaintiffs' well water was contaminated by toxic pollutants. The plaintiffs were awarded medical surveillance damages in response to proof of increased risk of cancer and other diseases. 525 A.2d at 308–13. The court held that medical surveillance damages are appropriate when a plaintiff can establish that monitoring is reasonable and necessary, stating:

> [W]e hold that the cost of medical surveillance is a compensable item of damages where the proofs demonstrate, through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which the individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

*Id.* at 312; *see also Miranda*, 15 Cal. Rptr.2d at 572–73 (discussing same factors for recovery); *Habitants Against Landfill Toxicants v. City of York*, 15 Envtl.L.Rep. (Envtl.L.Inst.) 20937 (Pa.Ct.C.P. York Co. May 20, 1985) (upholding "necessary" medical surveillance damages).

A federal district court in Pennsylvania articulated similar criteria in *Merry v. Westinghouse Electric Corp.*, 684 F.Supp. 847 (M.D.Pa.1988). Under the *Merry* test, a plaintiff must establish "(1) exposure to hazardous substances; (2) the potential for injury; and (3) the need for early detection and treatment" to recover medical monitoring expenses. *Id.* at 850; *see also In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 852 (3d Cir.1990) (outlining medical monitoring criteria).

## C. Utah Test for Recovery of Medical Monitoring Damages

■ The *Ayers* and *Merry* standards are instructive as we formulate our own standard. Building on the foundation they provide, we establish the following test for Utah courts to use in determining whether to award medical monitoring costs. To recover medical monitoring damages under Utah law, a plaintiff must prove the following: [10]

(1) exposure

(2) to a toxic substance,

(3) which exposure was caused by the defendant's negligence,

(4) resulting in an increased risk

(5) of a serious disease, illness, or injury

(6) for which a medical test for early detection exists

(7) and for which early detection is beneficial, meaning that a treatment exists that can alter the course of the illness,

(8) and which test has been prescribed by a qualified physician according to contemporary scientific principles.

■ First, the plaintiff must prove exposure, which we define as ingesting, inhaling, injecting, or otherwise absorbing the substance in question into the body. Second, the plaintiff must prove that the substance to which he or she was exposed is "toxic." We take our definition from the dictionary, which defines toxic by referring to "poison," a word that in turn is defined as "a substance that through its chemical action usually kills, injures, or impairs an organism." *Webster's New Collegiate Dictionary* 881 (1981). We note that the substance must be toxic to humans rather than to other forms of life. Third, the plaintiff

must prove that the exposure to the toxic substance was caused by the defendant's negligence, i.e., by the breach of a duty owed to the plaintiff.

■ Fourth, the plaintiff must prove that the exposure was of sufficient intensity and/or duration to increase his or her risk of the anticipated harm significantly over the plaintiff's risk prior to exposure. No particular level of quantification is necessary to satisfy this requirement of significantly increased risk. We reemphasize what should be apparent from our earlier discussion: Because the injury in question is the increase in risk that requires one to incur the cost of monitoring, the plaintiff need not prove that he or she has a probability of actually experiencing the toxic consequence of the exposure. It is sufficient that the plaintiff show the requisite increased risk. [11]

■ Fifth, the plaintiff must prove that the illness, the risk of which has been increased by exposure to the toxin, is a serious one. By this we mean an illness that in its ordinary course may result in significant impairment or death.

Sixth, the plaintiff must prove that a test exists for detecting the onset of the illness before it would be apparent to the layperson. If no such test exists, then periodic monitoring is pointless and no cause of action for monitoring exists. [12] In such a situation, the potential plaintiff is not harmed until the onset of the actual illness. At that time, he or she can bring an action for actual injury. [13]

Seventh, the plaintiff must prove that the periodic administration of the existing test would be beneficial to him or her, i.e., that a treatment exists that is more effec-

---

**10.** Proof of these elements will usually require expert testimony. *See* Slagel at 872.

**11.** One commentator has suggested that government data may provide toxic-tort plaintiffs with an inexpensive and convenient source of proof of increased risk. *See* Chapin at 148–57.

**12.** Of course, if a test is later developed that will detect the disease, a plaintiff would retain the right to demonstrate at some later date the effectiveness of the test and be compensated for

utilizing it, if all other elements of the cause of action are present.

**13.** The statute of limitations certainly will not run on a cause of action when a critical element of that cause, actual injury, has yet to evidence itself. *See Klinger v. Kightly,* 791 P.2d 868, 869 (Utah 1990); *cf. Wrolstad v. Industrial Comm'n,* 786 P.2d 243 (Utah Ct.App.1990) (striking down statute of repose barring workers' compensation for asbestosis victim as violative of open courts provision of the Utah Constitution).

tive in curing or ameliorating the consequences of the illness if administered before the onset of the illness becomes apparent to a layperson. Again, unless a treatment is available that would be more beneficial to the plaintiff if administered before the illness becomes obvious, then there is no cause of action because medical monitoring cannot fulfill its purpose. The plaintiff can await the onset of the illness to sue.

Eighth, it is not enough that early detection and treatment are shown to be theoretically beneficial. It also must be shown that administration of the test to a specific plaintiff is medically advisable for that plaintiff. To illustrate, a monitoring regime might be of theoretical value in detecting and treating a particular illness, but if a reasonable physician would not prescribe it for a particular plaintiff because the benefits of the monitoring would be outweighed by the costs, which may include, among other things, the burdensome frequency of the monitoring procedure, its excessive price, or its risk of harm to the patient, then recovery would not be allowed. This conforms with the fact that the substantive injury being remedied is the defendant's significantly increasing the plaintiff's risk of harm so that the plaintiff must incur medical monitoring expenses. Absent the advisability of monitoring for that particular plaintiff, the injury is not complete and no cause of action exists. As is the case where a test or a treatment does not exist, the plaintiff may sue when and if the illness occurs.

■ A word about the interaction of the eighth and fourth elements is warranted. The fourth element requires proof that the exposure caused by the defendant's negligence significantly increased the plaintiff's risk over whatever level of risk existed before that exposure. The eighth element requires a showing that monitoring is not only theoretically beneficial for early detection and treatment of the harm for which the plaintiff is more at risk, but that the monitoring is medically advisable for that plaintiff. In operation, these two elements require a particular plaintiff to prove that by reason of the exposure to the

toxic substance caused by the defendant's negligence, a reasonable physician would prescribe for her or him a monitoring regime different than the one that would have been prescribed in the absence of that particular exposure. George W.C. McCarter, *Medical Sue–Veillance: A History and Critique of the Medical Monitoring Remedy in Toxic Tort Litigation,* 45 Rutgers L.Rev. 227, 266–67 (1993) [hereinafter McCarter]. This is because under this cause of action, a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff, a change that would represent increased costs to the plaintiff. For example, if the plaintiff is exposed to a toxic substance in large quantities or for a long duration and later is negligently exposed to the same substance in a small quantity or for a short duration by the defendant, there should be no recovery from the one causing the later exposure if it does not change the monitoring regime that would have been appropriate to the plaintiff before that exposure. That person or entity would not have caused the plaintiff to incur a monitoring expense that he or she would not otherwise have had, and the elements of the cause of action would not be complete.

■ We emphasize that the advisable medical testing for a specific plaintiff must be shown to be "consistent with contemporary scientific principles" and "reasonably necessary." *Ayers,* 525 A.2d at 309. We therefore require not only that a doctor prescribe the test for this plaintiff, but also that the test is shown by expert testimony to be one a reasonable physician in the area of specialty would order for a patient similarly situated, i.e., facing a similar risk of the same serious illness from the same cause. *Cf.* Slagel at 875 ("[D]efendant should not be required to provide the plaintiff with untried tests of speculative value."). This dual requirement prevents recovery for costs of treatment not generally accepted by the medical community.

Guiding this entire inquiry, of course, is the general requirement that compensation for medical expenses in a tort action be reasonable and necessary. Charles J. McCormick, *Handbook on the Law of Damages* § 90, at 323–27 (1935); 1 Jacob A. Stein, *Stein on Personal Injury Damages* §§ 5:1–5:3 (2d ed. 1991). *See generally* 22 Am.Jur.2d *Damages* §§ 197–206 (1988). That is, only medical monitoring costs found to be reasonable and necessary will be compensable. This requirement adds yet another check to ensure that only meritorious claims are compensated and also demonstrates that this measure of damages is entirely consistent with basic tort principles. Finally, medical monitoring costs are recoverable only for the duration of the latency period, if known, of the illness in question. McCarter at 261.

### D. Application of the Medical Monitoring Test

In granting defendants' motion for summary judgment in this case, the trial court based its ruling on the ground that "no bodily injury has been manifested in any plaintiff." In so ruling, the trial court applied what we now determine to be the wrong legal standard. Having articulated the correct legal standard, we vacate the summary judgment and remand for further proceedings consistent with this opinion.

In so doing, we acknowledge that plaintiffs have not as yet proffered sufficient evidence to establish the criteria outlined above. For example, under our medical monitoring cause of action, plaintiffs can recover only if medical monitoring is *advisable* as a result of their exposure. However, the only evidence offered below by plaintiffs on this point was a letter from Dr. Battigelli, who examined Hansen, Hilton, Silcox, and Vickers at the Occupational Clinic for the Department of Family and Preventive Medicine. The letter states:

> In summary, we conclude that the exposure experienced by these workers, while working at the Mountain Fuel Supply building throughout the 6 months of their employment there, was limited and

perhaps inconsequential. This statement is based on the following grounds:

> . . . .
>
> 2. The duration of exposure, albeit deplorable in its lack of warning and absence of personal protective equipment, was admittedly limited in intensity and duration.
>
> 3. The workers by and large denied acute bouts of coughing, chocking [sic] and related symptoms which would suggest overwhelming exposure—nor do the procedures [used by the workers] suggest a large and intense generation of dust.
>
> 4. It is impossible for us to dismiss entirely the claim these workers present, relating adverse effects of this exposure setting to their health. However, the consequences[,] if any, will appear in years to come—fifteen and twenty years in fact usually elapse between exposure to asbestos and significant adverse effects. *There is no way to either anticipate their occurrence or to dismiss it altogether, at this time.*
>
> . . . .
>
> 6. This examination *may* be followed in two or three years with repeat chest x-rays (for exclusion of asbestos effect).

(Emphasis added.) The suggestion in paragraph 6 that plaintiffs "may" seek chest x-rays in two or three years to *exclude* asbestos effects is simply not enough to withstand summary judgment as to the medical advisability element. Indeed, as the emphasized portion of the letter indicates, rather than stating that medical monitoring is advisable, the letter may imply that medical monitoring is, in fact, unnecessary.

Having acknowledged that plaintiffs' showing below was insufficient, we think that in light of the unsettled state of the law on medical monitoring in Utah, the only fair course is to remand this matter to permit plaintiffs to attempt to meet the newly articulated standard. This is especially so since plaintiffs claimed in their final motion before the trial court that discovery was incomplete and represented to the court that further medical consultation was anticipated. If, after a fair opportuni-

ty, plaintiffs cannot satisfy the standard we articulate today, their claim should fail.

### E. Remedy

We add a final note on remedy. Should plaintiffs in this or any other medical monitoring case present a valid claim, the remedy should be limited to providing each plaintiff with the medical monitoring that has been necessitated by the actions of that defendant. This requires a word of explanation.

Because the cause of action we craft today provides a remedy for a plaintiff's need to incur future costs for medically advisable monitoring—a need caused by the defendant's negligence—and because absent an actual need for monitoring, no recovery can be had, the remedy should provide for the cost of medical monitoring actually received by the plaintiff, not for damages. For if monitoring is not actually provided to the plaintiff, then a significant theoretical element of his or her injury is missing, as our discussion above makes plain.

Although trial courts have ample equitable powers to assure that this remedy is provided, we suggest consideration of a court-supervised fund to administer medical surveillance payments. In the alternative, a defendant might be ordered to pay for insurance to fund the plaintiff's future medical monitoring needs. *See Ayers*, 525 A.2d at 313–14; *Burns v. Jaquays Mining*, 156 Ariz. 375, 752 P.2d 28, 34 (Ct.App. 1988). As the *Ayers* court observed:

> In our view, the use of a court-supervised fund to administer medical-surveillance payments ... is a highly appropriate use of the Court's equitable powers.... Such a mechanism offers significant advantages over a lump-sum verdict....
>
> ... [A] fund would serve to limit the liability of defendants to the amount of expenses actually incurred. A lump-sum verdict attempts to estimate future expenses but cannot predict the amounts that actually will be expended for medical purposes.... The public health interest is served by a fund mechanism

that encourages regular medical monitoring for victims of toxic exposure....

> Although there may be administrative and procedural questions in the establishment and operation of such a fund, we encourage its use by trial courts....

*Ayers*, 525 A.2d at 314.

We agree with the rationale of the *Ayers* court. Although we do not mandate a trust fund, leaving it to the trial court to fashion a suitable equitable remedy, we do hold that any award must provide for the defendant's payment of only the costs of the medical monitoring services that will actually be provided to the plaintiff. The trial court should not order payment to the plaintiff, in a lump sum or otherwise, of damages representing the costs of future monitoring. If the court establishes a trust fund and all of it is not used to pay for medical monitoring actually incurred by the plaintiff, the remainder should be returned to the defendant. For useful thoughts on the crafting of a remedy, see McCarter at 253–64.

## IV. DISPOSITION

We affirm the trial court's ruling on plaintiffs' negligent infliction of emotional distress claim, but reverse the ruling regarding medical monitoring. We remand for further proceedings consistent with this opinion.

ZIMMERMAN, Justice, concurring in part and concurring in the result:

I concur in parts I and III of Justice Durham's opinion. I join in the conclusion of part II and agree that plaintiffs' allegations are insufficient as a matter of law to support an action for negligent infliction of emotional distress. However, I do not join in part II's wide-ranging dictum to the effect that mental illness, in the absence of physical manifestation, is sufficient to support a claim. There is no need to attempt to decide this question for the purposes of this appeal, since under any theory plaintiffs' allegations are insufficient. Moreover, Justice Durham's dictum conflicts not only implicitly with the approach of a ma-

jority of this court in *Johnson v. Rogers*, 763 P.2d 771, 784 (Utah 1988) (opinion of Zimmerman, J., joined by Hall, C.J., Howe, Assoc. C.J., and Stewart, J.), but explicitly with what I think are the better-reasoned authorities she cites but does not follow.

HALL, C.J., and HOWE, Associate C.J., and STEWART, J., concur in the concurring opinion of ZIMMERMAN, J.