David **GEORGE**, individually, and as personal representative of the heirs of Betty George, deceased, Plaintiff and Appellant,

v.

**LDS HOSPITAL, et al., Defendants and Appellees.**

No. 890381–CA.

Court of Appeals of Utah.

Aug. 31, 1990.

---

Steve Russell (argued), and Kathryn P. Collard, Collard and Russell, Salt Lake City, for plaintiff and appellant.

Brinton R. Burbidge (argued), Merrill F. Nelson and Larry R. White, Kirton, McConkie & Poelman, Salt Lake City, for LDS Hosp.

Elliot Williams and Larry A. Laycock, Snow, Christensen & Martineau, Salt Lake City, for Kimball Lloyd, M.D.

J. Anthony Eyre and Michael F. Skolnick, Kipp and Christian, P.C., Salt Lake City, for Michael Lahey, M.D.

Before BENCH, DAVIDSON and ORME, JJ.

## OPINION

DAVIDSON, Judge:

Plaintiffs, the husband and heirs of decedent Betty George, sought recovery in a wrongful death action against LDS Hospital, Dr. Kimball Lloyd, and Dr. Michael Lahey. Plaintiffs appeal from a jury verdict finding that defendant LDS Hospital was negligent in its care of Mrs. George, but that defendant's negligence was not a proximate cause of Mrs. George's death. Dr. Lloyd and Dr. Lahey reached a settlement with the plaintiffs prior to trial, although the doctors remained in the case for purposes of determining comparative negligence. The jury concluded that the doctors were not negligent and assigned 100 percent responsibility to the hospital.

Plaintiffs' motion for a new trial was denied by the trial court. On appeal, plaintiffs claim that the trial court committed reversible error in the jury instructions. We reverse and remand for a new trial.

## FACTS

On July 28, 1986, Dr. Lloyd admitted Mrs. George to LDS Hospital for a hysterectomy and exploratory surgery. The surgery was performed on July 29 without apparent complications. On the morning of July 30, Dr. Lloyd ordered that Mrs. George be ambulated four times daily, that she receive incentive spirometry[1] every

---

**1.** An incentive spirometer measures the volume of air entering and leaving the lungs. Use of the device expands a patient's diaphragm, while

hour while awake, and that the nurses instruct her to cough and breathe deeply. This treatment was intended to increase Mrs. George's breath capacity, which is typically depressed following a patient's abdominal surgery.

Mrs. George's breathing deteriorated during July 31. On the morning of August 1, Dr. Lloyd ordered that a chest X-ray and lung profusion scan be taken to determine whether Mrs. George had a pulmonary embolism. Although these tests proved negative for a pulmonary embolism, they did indicate the possibility of bilateral atelectasis.[2] In the early afternoon of August 1, Dr. Lloyd called in Dr. Lahey and the hospital's respiratory therapy department to assist him in resolving Mrs. George's pulmonary condition.

Dr. Lloyd ordered that Mrs. George undergo an angiogram in a further attempt to determine whether she had a pulmonary embolism. Mrs. George was taken to the intensive care unit (ICU) for an angiogram at 10:20 a.m. on August 2. The angiogram was completed at about 1:00 p.m., at which time Dr. Lloyd learned that the test result for a pulmonary embolism was negative.

A nurse found that Mrs. George was having difficulty breathing, and that Mrs. George was incoherent upon returning from ICU at 2:20 p.m. She did not inform Dr. Lloyd of this condition. The charge nurse telephoned Dr. Lloyd at about 3:00 p.m. to inform him that Mrs. George had returned to OB/GYN from ICU, but she also failed to notify Dr. Lloyd of Mrs. George's deteriorating physical and mental condition.

At 3:00 p.m., another nurse took over the care of Mrs. George. This nurse was a one-to-one special-duty nurse, whose only assignment was to monitor Mrs. George's condition. At about 3:30 p.m., a written notation was made in the chart that Mrs. George was disoriented and incoherent. A second-year resident physician was unable at this time to determine Mrs. George's blood pressure and the nurses had difficul-

ty making Mrs. George bleed for a glucose test. Neither Dr. Lloyd nor Dr. Lahey were informed of these adverse changes in Mrs. George's condition.

At about 4:00 p.m., the resident physician telephoned Dr. Lloyd to tell him that Mrs. George was febrile. Dr. Lloyd was not informed during this conversation that Mrs. George exhibited symptoms of hypoxia and he did not receive further reports until being told of Mrs. George's cardiac arrest. Dr. Lahey did not receive any further medical reports until 7:00 p.m., at which time he also was told that Mrs. George had suffered a cardiac arrest.

The record indicates that the resident physician did not visit Mrs. George between 5:00 p.m. and 7:00 p.m. The record also shows that the special-duty nurse failed to continuously monitor Mrs. George and to notify a supervisor of Mrs. George's respiratory distress. Furthermore, the special-duty nurse was not even in the room when Mrs. George stopped breathing and suffered her first cardiac arrest.

Mrs. George stopped breathing in front of her visiting daughter at about 7:00 p.m. The daughter then had to run out of the hospital room in search of a nurse. A code was called at 7:04 p.m., in which cardiopulmonary resuscitation was sought for Mrs. George. Breathing assistance for Mrs. George was initiated at about 7:13 p.m. During the interval between the cessation of breathing and breathing assistance being initiated, Mrs. George suffered a lack of oxygen to her brain. Although her heart beat was reestablished, Mrs. George was comatose after the cardiac arrest. Two days later, Mrs. George died following a second cardiac arrest.

## JURY INSTRUCTIONS

Two of the trial court's jury instructions are at issue in this action. The court's Jury Instruction # 16A provided:

---

also providing an incentive for a patient to breathe more deeply.

2. Atelectasis is the collapse of an expanded lung, resulting in an insufficient flow of air to the lung's air sacs.

The plaintiff in this case cannot recover against the doctors or the hospital unless it is proven, that,

1. Dr. Kimball Lloyd, Dr. Michael Lahey or LDS Hospital's nursing staff or respiratory therapist or all of them, based on a degree of reasonable medical probability, failed to exercise that degree of reasonable care and skill in caring for the plaintiff that was ordinarily possessed and used by others in the respective profession practicing in 1986 in Salt Lake City, Utah, or similar communities under similar circumstances;

2. Based on a degree of reasonable medical probability established through expert medical testimony from a duly qualified medical doctor, that such failure, if any, was the proximate cause of the death of Betty George; and

3. That David George personally, and the heirs of Betty George, and the representative of the estate of Betty George, was damaged by the negligence, if any, of one of the defendants or all of them. If you do not find, by a preponderance of the evidence, all of the foregoing propositions with regard to either Dr. Kimball Lloyd, Dr. Michael Lahey or LDS Hospital, the party or parties, as the case may be, against whom any one proposition is not found cannot be found to have committed medical malpractice and your verdict must be in favor of the defendant or defendants. If you find that the evidence is evenly balanced on any of the above-mentioned issues, then your verdict should be for the defendant or defendants on whose behalf the evidence is evenly balanced.

The court's Jury Instruction # 21A provided:

You are instructed that where the proximate cause of Betty George's death and therefore the injury or loss claimed by plaintiff is not established by a preponderance of the evidence based on reasonable medical probability from testimony of a medical doctor, but is left to conjecture or speculation and may be reasonably attributed to causes over which the hospital or doctor had no control or re-

sponsibility, then the plaintiff has failed to sustain the burden of proof as to proximate causation.

The jury returned a special verdict finding LDS Hospital negligent in its care of Mrs. George, but not finding that the negligence was a proximate cause of Mrs. George's death. Plaintiffs claim on appeal that jury instructions # 16A and # 21A prevented the jury from meaningfully considering the testimony of plaintiffs' expert witnesses. Plaintiffs also claim that jury instructions # 16A and # 21A precluded the jury from awarding damages where the hospital's negligence was only a contributing proximate cause of Mrs. George's death.

## EXPERT WITNESSES

The trial court admitted the testimony of plaintiffs' expert witnesses, respiratory therapist Donald Owings and nurse Harriett Gillerman, to explain the hospital's duty to Mrs. George and the hospital's breach of this duty. Owings testified that a respiratory therapist has a duty to notify a physician or other supervisor if a patient does not respond to respiratory therapy. Based on Mrs. George's failure to respond to the prescribed respiratory therapy, Owings offered his expert opinion that the hospital's respiratory therapist breached his duty by failing to notify the proper persons of Mrs. George's deteriorating pulmonary condition.

Nurse Gillerman testified that ambulation and incentive spirometry are used to prevent and treat atelectasis. Gillerman offered her expert opinion that the nurses, in failing to follow physician's orders to have Mrs. George ambulated and to use incentive spirometry on August 1, thereby breached their duty to her. Gillerman also testified that the nurses breached their duty by failing to perform a neurological assessment of Mrs. George when Mrs. George showed discernible signs of respiratory distress or hypoxia and by failing to timely notify the doctors of her rapidly deteriorating condition.

Defendant counters that an expert witness cannot testify about an area of medi-

cine in which he or she is not personally familiar. The record clearly indicates, however, that Gillerman and Owings testified only to the standards of care in their respective fields. The trial court recognized these witnesses as experts and admitted their testimony, yet the court, through the jury instructions, prevented the jury from considering their testimony.[3]

The Utah Supreme Court has stated that "[a]n appeal challenging the refusal to give jury instructions presents questions of law only. Therefore, we grant no particular deference to the trial court's rulings." *Ramon By And Through Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989). The parties in this case dispute the trial court's conclusions of law as stated in the jury instructions.

This court has stated that "[i]n medical malpractice actions the plaintiff must provide expert testimony to establish: 1) the standard of care, 2) defendant's failure to comply with that standard, and 3) that defendant caused plaintiff's injuries." *Hoopiiaina. v. Intermountain Health Care*, 740 P.2d 270, 271 (Utah Ct.App.1987) (citations omitted); *see Nixdorf v. Hicken*, 612 P.2d 348, 351 (Utah 1980). Plaintiff's experts testified as to the hospital's standard of care, the hospital's failure through its employees to meet this standard, and Mrs. George's subsequent cardiac arrest.

Courts have recognized that "[n]urses are specialists in hospital care who, in the final analysis, hold the well-being, in fact in some instances, the very lives of patients in their hands." *Utter v. United Hosp. Center, Inc.*, 236 S.E.2d 213, 216 (W.Va.1977), *reh'g denied* (1977) (negligent failure of nurses to observe plaintiff's condition). Courts have also recognized that a nurse may have a duty to notify her supervisor that a life-threatening situation exists and that failure to perform this duty may be a proximate cause of plaintiff's additional in-

jury. *See Campbell v. Pitt County Memorial Hosp., Inc.*, 84 N.C.App. 314, 352 S.E.2d 902, 908–9 (1987).

■ The jury must be allowed to decide whether the hospital's failure to notify the doctors of Mrs. George's change in medical status, which may have indicated either hypoxia or sepsis, was a breach of the duty owed to Mrs. George. The trial court erred in not allowing the jury to base its decision on the plaintiffs' expert testimony. *See Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 510 P.2d 190, 196 (1973), *reh'g denied* (1973) (nurses' delay in notifying physician of plaintiff's condition); *see also Darling v. Charleston Community Memorial Hosp.*, 33 Ill.2d 326, 211 N.E.2d 253, 258 (1965), *reh'g denied* (1965) (nurses failed to recognize and inform physician of change in patient's condition, where the condition became irreversible within a matter of hours).

### PROXIMATE CAUSE

According to the hospital pathologist, the combination of atelectasis, pulmonary embolism, and sepsis probably led to hypoxia and this, in turn, resulted in Mrs. George's first cardiac arrest and subsequent death. Both parties agreed that hypoxia and sepsis were significant contributing causes of Mrs. George's death. Plaintiffs' and defendant's expert witnesses also agreed that sepsis and pulmonary embolism produce similar symptoms.

■ Defendant argues that Mrs. George would inevitably have died of sepsis after 2:20 p.m. on August 2, that her septic condition was not caused by negligence, and that any negligence on the hospital's part was therefore not a proximate cause of Mrs. George's death.[4] The medical record shows that sepsis was not diagnosed until August 3, the day *after* Mrs. George's first cardiac arrest. Plaintiffs assert that the hospital's negligent failure to notify Dr.

---

3. This error was compounded by the court consistently stating throughout trial that cause of death was not an issue in the case and that expert testimony need not address that subject, only to then give a jury instruction focusing on causation as established by medical testimony.

4. Such an argument is problematic. It would be unacceptable, for obvious policy reasons, to permit hospitals or doctors to escape responsibility for the negligent treatment of gravely ill persons upon a showing that the patient's condition was terminal and he or she was going to die anyway.

Lloyd or Dr. Lahey of Mrs. George's deteriorating condition at a minimum contributed to her continued deterioration and may have hastened her death by depriving her of the chance to receive earlier diagnosis and treatment.

Although defendant asserts that Mrs. George's death due to sepsis was inevitable, defendant's expert witness, Dr. Charles Elliot, testified under cross-examination that sepsis may be reversible. Dr. Lewis Weinstein, another of defendant's expert witnesses, testified under cross-examination that sepsis may be treatable, that sepsis did not occur instantaneously in Mrs. George's case, and that prompt treatment of sepsis may facilitate a patient's recovery. The record therefore does support plaintiff's argument that the nurses' failure to notify Dr. Lloyd or Dr. Lahey of Mrs. George's deteriorating condition may well have prevented the doctors from timely diagnosing and treating her.

"[E]vidence which shows to a reasonable certainty that negligent delay in diagnosis or treatment increased the need for or lessened the effectiveness of treatment is sufficient to establish proximate cause." *James v. United States*, 483 F.Supp. 581, 585 (N.D.Ca.1980). Another court found the defendant's assertion that operating upon the patient in a timely manner would not have increased her chance of survival unsupported by the record. *See Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966). The *Hicks* court concluded that defendant's "negligence nullified whatever chance of recovery she might have had and was the proximate cause of the death." *Id.* at 633.

In a case where the chances of saving a patient's life would have been increased if a physician had been timely notified of the patient's condition, a court found that whether the nonfeasance of the nurses was a contributing proximate cause of death was a question of fact. *See Goff v. Doctors General Hosp. of San Jose*, 166 Cal. App.2d 314, 333 P.2d 29, 33 (1958). The Pennsylvania Supreme Court found error in a trial court's jury instructions because of "the unmistakable implication in this passage that defendant's negligence had to be the *sole* cause of death in order to bring liability to the defendant when, in fact, liability could attach if the negligence of the defendant were but a substantial factor in bringing about the death." *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1289 (1978) *reh'g denied* (1978) (original emphasis). *Hamil* relied on the Restatement (Second) of Torts § 323(a) (1965)[5] as authority for the proposition that liability may be found where negligence increases a party's risk of harm.

■ A jury could have reasonably concluded that the failure of the nurses to notify Dr. Lloyd or Dr. Lahey of Mrs. George's change in condition prevented them from diagnosing, treating, and possibly saving her life and that this failure therefore was a proximate cause of her worsened condition and ensuing death. *See* Morris, *The Negligent Nurse—The Physician and the Hospital*, 33 Baylor L.R. 109, 116 (1981) (the significance of proximate cause as applied to a nurse's negligence). The trial court's jury instructions therefore improperly implied that the jury could find only one proximate cause of Mrs. George's death.

Based upon the errors arising from the improper jury instructions, we reverse and remand for a new trial against defendant LDS Hospital. The verdict of no cause of action against the defendant doctors is affirmed.

Because we remand for new trial, it is unnecessary to reach the other issues raised by appellant.

BENCH and ORME, JJ., concur.

---

**5.** Restatement (Second) of Torts § 323 (1965) provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm. . . .