**Nels ANDERSEN, Plaintiff,**

v.

**BRIGHAM YOUNG UNIVERSITY, a Utah non-profit corporation, and Joseph C. Bingham, M.D., Defendants.**

Civ. No. 93–C–61G.

United States District Court,
D. Utah,
Central Division.

Feb. 24, 1995.

---

4. Pleading number 19, filed on September 8, 1994.

5. Pleading number 9, filed on August 15, 1994.

Jackson Howard, Howard Lewis & Petersen, and Phillip Lowry, Provo, UT, for plaintiff.

David B. Thomas and H. Hal Visick, Provo, UT, for Brigham Young University.

Anthony Eyre, Kipp & Christian, Salt Lake City, for Joseph C. Bingham.

## MEMORANDUM DECISION AND ORDER

**J. THOMAS GREENE, District Judge.**

This matter came before the Court on defendants' motion for summary judgment as well as other motions. Jackson Howard and Phillip Lowry of Howard, Lewis & Petersen appeared for plaintiff Nels Andersen. David B. Thomas and H. Hal Visick represented defendant Brigham Young University ("BYU"), and Anthony Eyre of Kipp & Christian represented defendant Dr. Joseph Bingham. The parties filed extensive memo-randa and supporting materials, after which the Court heard oral argument and took the matter under advisement. Now being fully advised, the Court renders its Memorandum Decision and Order.

## BACKGROUND FACTS

Plaintiff Nels Andersen was a student attending BYU in Provo, Utah. On February 6, 1990, plaintiff went to the BYU McDonald Health Center, and was seen by Dr. Joseph Bingham. At that time, plaintiff complained of fevers, night sweats, intermittent coughing, and occasional headaches and nausea. Dr. Bingham advised Andersen that his symptoms were consistent with a "viral syndrome." No further tests were conducted. Andersen returned to Dr. Bingham on two occasions, each time complaining of similar symptoms. Dr. Bingham prescribed an antibiotic, which gave the plaintiff some relief. Less than one week after his final visit to Dr. Bingham, Andersen returned to his home in California. From April 1990 to about August 1990, he had no further symptoms.

On August 24, 1990, Andersen went to the emergency room at the UCLA Medical Center complaining of high fever and vomiting. He was referred to the UCLA infectious disease clinic for diagnosis. After several weeks of extensive testing, Andersen was referred to the Hematology/Oncology Department at the UCLA Medical Center. On September 5, 1990, Dr. Gary Schiller diagnosed Andersen's disease as Hodgkin's Disease, stage III–B.[1] Andersen received a course of treatment including chemotherapy, which was completed in March, 1991.

Andersen remained disease-free for approximately twenty-two months, until January 1993, when additional disease was found in his abdomen. Andersen underwent another treatment of chemotherapy. At the time this lawsuit was filed, Andersen was disease-free.

---

1. Hodgkin's Disease is a variety of lymphoma or cancer, which is divided into "stages" for purposes of prognosis. In Stage I, the disease is confined to one group of lymph nodules; in Stage II, the disease is confined to more than one nodule group, all on one side of the diaphragm; in Stage III, the disease is in multiple nodule groups on both sides of the diaphragm; Stage IV includes any involvement of bone marrow or the liver. The "stages" are also classified into subgroups, Subgroup A being asymptomatic, and Subgroup B exhibiting a variety of symptoms.

Following Andersen's first chemotherapy treatment, Andersen's doctor, Dr. Schiller, was of the opinion that Andersen had a 60% chance of long-term, disease-free survival.[2] Dr. Schiller was also of the opinion that if Andersen's condition had been diagnosed and treated when Andersen was at BYU, assuming that Andersen was afflicted with the disease at that time, his chances for long-term, disease-free survival would have been 80–90%. Andersen filed suit, claiming negligence on the part of the defendants for failure to diagnose his disease during his treatment at the BYU health center, and claiming that he had sustained a reduction in his chances of long-term, disease-free survival.

Following discovery, defendants filed a motion for summary judgment, and subsequently filed a motion to limit the testimony of the plaintiff's designated expert witness. Plaintiff responded to the motion for summary judgment, and filed a motion for leave to designate an additional expert witness, as well as other motions.

### STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607 (10th Cir.1994).

### ANALYSIS

The fundamental matter before the Court on summary judgment is whether plaintiff has suffered a cognizable injury upon which a claim for relief can be supported. In this regard, plaintiff alleges two types of injury: (1) reduction in his long-term chance for

**2.** This figure was derived from survival statistics of those Hodgkin's Disease patients who had

disease-free survival; and (2) negligent infliction of emotional distress. Defendants maintain that plaintiff has not demonstrated a prima facie case in negligence under either of the claims because no injury in fact has been suffered by plaintiff.

## I. LOSS OF CHANCE AS A COGNIZABLE THEORY FOR RECOVERY IN NEGLIGENCE CASES

### A. In General

The loss of chance concept came into being in connection with cases where terminally-ill patients complained of medical malpractice. Under traditional negligence concepts, a terminal patient with a statistical probability of less than 50% of survival would be unable to prove causation, because by definition it would not be "more likely than not" that the medical malpractice caused the patient's death. The concept of loss of chance was developed to mitigate the harshness of this rule.

In the seminal case of *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966), the Fourth Circuit addressed the loss of chance theory of recovery. In that case, a diabetic patient was taken to a hospital for abdominal pain and vomiting. The patient was diagnosed as having a minor problem and sent home where she died. Evidence disclosed that proper testing would have revealed a high obstruction or blockage of her intestine. An action was brought in which it was alleged that the doctor's negligence had caused the decedent's death. Expert testimony established that the patient would have survived with prompt diagnosis and surgery. The government argued that there was no proof that the doctor's negligence, if any, was the proximate cause of death. The government contended that even had the doctor properly diagnosed the intestinal blockage the decedent would have required surgery, and it was mere speculation to say that she would have survived the surgery. The Fourth Circuit stated:

undergone chemotherapy, as Andersen did.

[w]hen a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was *any substantial possibility of survival* and the defendant has destroyed it, he is answerable.

*Id.* at 632 (emphasis added). The court determined that the doctor's negligence nullified any chance of decedent's recovery, and therefore was a proximate cause of her death.

■ Following *Hicks,* several jurisdictions adopted various approaches to allow an aggrieved plaintiff to recover in such a situation. *See, e.g., Jeanes v. Milner,* 428 F.2d 598 (8th Cir.1970) (applying Arkansas law); *Roberson v. Counselman,* 235 Kan. 1006, 686 P.2d 149 (1984); *Falcon v. Memorial Hosp.,* 436 Mich. 443, 462 N.W.2d 44 (1990); *Perez v. Las Vegas Medical Ctr.,* 107 Nev. 1, 805 P.2d 589 (1991). Three main theories or approaches have evolved. *First,* some courts have relaxed the degree of certainty required to prove proximate cause, and have adopted the "substantial factor" test instead of the "reasonable probability" test. Under the substantial factor test, a plaintiff need not show that the negligence in question was more likely than not the cause of the injury, but only that the alleged negligence was a substantial factor. *See, e.g., Daniels v. Hadley Memorial Hospital,* 566 F.2d 749 (D.C.Cir.1977).[3] The *second* approach espoused by some courts is to adopt directly the "substantial possibility" standard from *Hicks.* Under this approach, sufficient proof of causation would be deemed to exist upon a showing that the substantial possibility of recovery was lessened because of the alleged negligence. *See, e.g., Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972); *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985).

■ Under both of the theories just described only the issue of causation is addressed, and not the issue of damage or injury. This is because in all of the above-noted cases the patient subjected to the negligent treatment died or suffered a physical injury, so whether actual injury had been sustained was not an issue.

■ A third approach spawned by *Hicks* changes the focus as in this case from causation to the existence or nonexistence of an injury in fact. Under this theory, the loss of a significant chance is proclaimed as a new and separate cause of action. The required showing of the existence of an injury is viewed as the loss of a statistical chance of cure or survival, without requiring the patient's death or actual physical injury. *See, e.g., DeBurkarte v. Louvar,* 393 N.W.2d 131 (Iowa 1986); *O'Brien v. Stover,* 443 F.2d 1013 (8th Cir.1971) (applying Iowa law). Generally, under this approach if a patient suffers a reduced statistical chance of recovery or survival due to negligence or malpractice, the patient can recover even if no death or physical injury has actually occurred.

---

3. A somewhat similar approach was adopted in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978). In that case, the Pennsylvania Supreme Court relied on both *Hicks* and Section 323 of the Restatement (Second) of Torts to sustain a cause of action where the alleged negligence increased the risk of harm to the patient. Section 323 provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm.

The *Hamil* court explained that under this theory of relaxing the standard of care,

once a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which section 323 applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

*Id.* at 1288. In *Sherer v. James,* 290 S.C. 404, 351 S.E.2d 148, 150 (1986), the South Carolina Supreme Court criticized *Hamil* and observed that section 323(a) of the Restatement (Second) of Torts acts merely to establish a duty on one who undertakes to provide services and should not be read to apply to proximate cause.

The facts in this case illustrate how the third identified approach—the loss of significant chance—could be applied as advanced by the plaintiff. When Andersen was diagnosed with Hodgkin's Disease in September 1990, his statistical chances for long-term disease-free survival were roughly 60%. Assuming that Andersen was suffering from the disease when he was seen by Dr. Bingham at BYU, and assuming that the disease at that time was in an earlier stage, namely II–B, the statistical chances for long-term disease-free survival would have been roughly 80–90%. When this case was filed, Andersen had undergone treatment and was disease free, but plaintiff claims that at that time, he had sustained a present injury because of the reduction from 80–90% to 60% of long-term chances for disease-free survival from Hodgkin's Disease.

## B. Loss of Chance Theory in Utah

 Because plaintiff claims only a reduction in his statistical chance of long-term survival as his disease related injury, the specific legal issue before this Court is whether loss of chance as a separate cause of action is recognized in Utah. Unless Utah recognizes loss of chance as a new and independent cause of action, the sticking point is whether plaintiff has sustained cognizable injury based on the statistical probability that his chances of continued disease-free survival have been reduced. Clearly, the existence of an injury is a required element in negligence cases in Utah.[4]

Both sides cite the intermediate Utah Court of Appeals case of *George v. LDS Hospital,* 797 P.2d 1117 (Utah Ct.App.1990), as indicative of Utah law. In *George,* a team of nurses failed to inform the decedent's doctors of her deteriorating condition. Experts offered testimony to the effect that the patient would have died after a certain time from sepsis, or infection, irrespective of the doctors being notified, but on cross-examination they acknowledged that the sepsis may

have been treatable. The jury found that the hospital had been negligent in failing to inform the doctors, but found that the negligence was not the proximate cause of the decedent's death. The Utah Court of Appeals reversed and remanded, finding that one of the jury instructions incorrectly implied that the jury could find only one proximate cause of death. The court cited *Hicks* and other loss of chance cases for the proposition that where the chances of saving a life would be increased absent negligence or malpractice, a jury could find such negligence or malpractice to be *a* proximate cause of subsequent injury or death. *George* is distinguishable from the facts in this case, however. In *George,* there was an actual injury suffered because the patient died. *George* does not purport to recognize or create a new cause of action for mere reduction of statistical chances for survival.

Defendants cite *Newsom v. Gold Cross Service, Inc.,* 779 P.2d 692 (Utah Ct.App. 1989), for the proposition that Utah has not recognized a "loss of chance" theory of recovery. *Newsom* is likewise distinguishable from the facts in this case, however, and is not controlling. In *Newsom,* the plaintiff failed to preserve an objection at trial with regard to loss of chance as a theory for recovery, so the Utah Court of Appeals refused to address the theory.

The Supreme Court of Utah has not directly spoken to loss of chance as a possible separate and new cause of action. The most applicable Utah case to the facts of this case appears to be *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970 (Utah 1993). In that case, the Utah Supreme Court addressed claims brought by plaintiffs who were exposed to asbestos on the job. The injuries asserted by plaintiffs included severe coughing, respiratory distress, eye irritation, headaches, and nausea. A doctor who examined the plaintiffs concluded that the examinations had produced no evidence of respiratory disorders which could have been mean-

---

4. A prima facie case in negligence is made out in Utah upon demonstration that (1) defendant had a duty to the plaintiff; (2) defendant breached that duty; (3) defendant's conduct was the cause-in-fact of the injury as well as the proximate cause; and (4) *as a result, plaintiff sustained*

injury. *See Harris v. Utah Transit Auth.,* 671 P.2d 217 (Utah 1983). These principles apply in medical malpractice cases as well as in ordinary negligence cases. *See Martin v. Mott,* 744 P.2d 337, 338 (Utah Ct.App.1987); *Kitchen v. Cal Gas Co.,* 821 P.2d 458, 461 (Utah Ct.App.1991).

ingfully related to the exposure to asbestos. Additionally, none of the employees suffered from any asbestos-related diseases at the time of trial. The Utah Supreme Court affirmed summary judgment, finding insufficient evidence of injury. The court said:

> Thus we have nothing more than plaintiffs' bare allegations to support their claims of harm. Such allegations are insufficient to withstand summary judgment. *Plaintiffs may, of course, bring another action if and when they do develop a serious disease as a result of their exposure.*

*Id.* at 973 (emphasis added). While *Hansen* was not argued as a loss of chance case, the Utah Supreme Court held that the existence of some actual health-related injury is required as a basis for recovery.

 This Court is satisfied that Utah has not adopted a separate cause of action permitting recovery for the reduction of a statistical chance of long-term survival, and this Court is not inclined to make an "eerie guess" that the Supreme Court of Utah will do so. Accordingly, defendants' motion for summary judgment as to plaintiff's claim for relief under the loss of chance theory is granted.

## II. *NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS*

Plaintiff also claims to have a compensable loss for the emotional pain or distress he suffered because of the alleged delay in treatment by the defendants. Again, defendants argue that the plaintiff has not proven an essential element of negligent infliction of emotional distress, namely physical injury or illness.

 In *Hansen,* the Utah Supreme Court refused to compensate for emotional pain or distress arising out of fear of future illness. Justice Durham wrote an opinion wherein she discussed the possibility of compensating for purely psychological injury, without any accompanying physical manifestations. However, the other four justices refused to join in that section of her opinion, siding with Justice Zimmerman's concurring opinion. Justice Zimmerman referred to a majority holding in *Johnson v. Rogers,* 763 P.2d 771

(Utah 1988), wherein the court adopted the standards set forth in section 313 of the Restatement (Second) of Torts (1965). Section 313 states that a person who unintentionally causes emotional distress to another may be subject to liability for *resulting illness or bodily harm.* As such, the approach adopted in *Johnson* and followed in *Hansen* requires that there be some physical illness or injury to recover for negligent infliction of emotional distress.

 In the instant case, the plaintiff has provided no evidence of any such physical illness or injury stemming from any allegedly negligent acts of the defendants independent of symptoms related to plaintiff's Hodgkin's Disease. Accordingly, this Court grants defendants' motion for summary judgment as to plaintiff's claim of negligent infliction of emotional distress.

Because the granting of the defendants' motion for summary judgment is dispositive in this matter, this Court need not address other motions filed by both parties.

Based upon the foregoing, it is hereby

ORDERED, that defendants' motion for summary judgment is GRANTED.

Counsel for defendants are directed to prepare and lodge with the Court a form of judgment consistent with this decision, after first complying with Local Rule 206.