**Marilyn CRANER, Plaintiff,**

v.

**NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, dba Northwestern Mutual Life, a corporation, Defendant.**

**No. 2:96–CV–1063.**

United States District Court, D. Utah, Central Division.

July 13, 1998.

C. Blaine Morely, Salem, OR, Wendell E. Bennett of Wendell E. Bennett & Associates, Salt Lake City, UT, for Plaintiff.

Mary Anne Q. Wood, Sheri A. Mower of Wood Crapo L.L.C., Salt Lake City, UT, for Defendant.

## MEMORANDUM DECISION and ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on cross motions for summary judgment for alleged breach of a written agreement for life insurance coverage. The motions were argued after extensive memorandums of law and other materials were filed. Plaintiff was represented by C. Blaine Morely, and Wendell E. Bennett of Wendell E. Bennett & Associates. Defendant was represented by Mary Anne Q. Wood and Sheri A. Mower of Wood Crapo LLC. Post hearing memorandums were filed contemporaneously with leave of court on May 18, 1998, and the case was taken under advisement. Now being fully advised, the court enters its Memorandum Decision and Order.

### FACTS

In February, 1996, Stephen Craner phoned Kent Lambert, an agent of defendant Northwestern Mutual Life ("NML"), requesting life insurance coverage. Mr. Craner sought coverage as soon as possible, and in order to accommodate this request, Mr. Lambert suggested that Mr. Craner obtain the necessary medical examination, after which they should

meet in order to complete an insurance application. Mr. Craner underwent the medical examination on February 27, 1996. On the next day, February 28, the two met and together completed an application for a $500,000 life insurance policy. Mr. Lambert asked and Mr. Craner orally responded to questions on the insurance application form. Mr. Lambert recorded the responses on the form, and signed as agent, certifying that he had "asked all questions and have completely and correctly recorded the insured's answers...." He further certified that the application and other documents "were signed by the insured ... in my presence after all questions were answered and recorded." Mr. Craner signed the Medical Questionnaire in which the below noted answers were given under a declaration that "my answers and statements are correctly recorded, complete and true to the best of my knowledge and belief." Mr. Craner's response to two of the questions was as follows:

Question 33: "In the past 10 years, have you been told you had or been treated for: ... (c). Anxiety, depression, stress, or any psychological or emotional condition or disorder?"

Mr. Craner's response: "No."

Question 36: "Other than as previously stated on this application, in the last five years have you: a. Consulted any other health care providers (medical doctor, psychiatrist, psychologist, osteopath, chiropractor, counselor, therapist or other)?"

Mr. Craner's response: "No."

On February 28, 1996, Mr. Craner signed and received a copy of the insurance application document which was entitled on the front page, "CONDITIONAL LIFE INSURANCE AGREEMENT" ("Agreement"), and provided Mr. Lambert with $172.52 (one month's premium). The document also bore the notation on the front page: "RECEIPT FOR PAYMENT AND CONDITIONAL LIFE INSURANCE AGREEMENT," followed by bold language

**"Not a Binder—No Insurance if Section 1 Applies."**

Section I of the document on the first page provides:

**I. Unacceptable Risks—No Insurance in Force.** No insurance or additional benefits will be in force at any time under the terms of this Agreement if the proposed insured is not a risk acceptable to Northwestern Mutual Life on the Underwriting Date according to its rules and standards.

One of the terms of the Agreement is

If the premium is paid when the application is taken, no life insurance will be in effect if Section I. of the Conditional Life Insurance Agreement applies.

Section III of the Agreement provides:

**III. Underwriting Date—When Insurance Begins.** *For acceptable risks* insurance begins on the Underwriting Date, which is the later of:

**A.** The date of application ...; or,

**B.** the date of the nonmedical, paramedical or medical examination.

(Emphasis added.)

Mr. Craner signed the document as "Applicant," and Mr. Lambert signed as "Licensed Agent."

The Agreement also included a "Notice of Insurance Information Practices" and "Insured's Authorization to Obtain and Disclose Information." The "Insured's Authorization" form provides that the authorization "is valid for 30 months from the date it is signed." The "Notice of Insurance Information Practices" given to Mr. Craner states that the insurance company may request an investigative consumer report "about your character, general reputation, personal characteristics, mode of living and health...." It also provides:

We may call you from our Home Office in Milwaukee to confirm or add to this information. The questions asked during the phone interview will be detailed so you may wish to have records about your income and health history at hand.

We need such information *to see if you qualify for the insurance....* (Emphasis added.)

The insurance agent is required as a part of the application to "remind your client that he/she may receive a phone call from the Home Office to Conduct a Personal History Interview." Mr. Lambert as the insurance agent signed the document certifying that he has given the applicant a copy of "Notice of Insurance Information Practices."

In the last part of the Conditional Insurance Agreement the following is set forth: **"NOT A 'BINDER'—No Agent May Modify the Terms of this Agreement— NO INSURANCE IF SECTION I APPLIES."**

On March 8, 1996, Veronica Brame of NML called Mr. Craner to conduct a Personal History Interview with him. Among other things, she asked the following question:

Question 8: "Have you ever been convicted of violating any criminal law other than a traffic violation?"

Mr. Craner's response: "No."

In response to another question, Mr. Craner revealed that he had seen a psychologist once per week due to the death of his son, starting in December of 1995. In this regard, Mr. Craner provided Ms. Brame the name and location of his doctor, Dr. Austin Chiles.

On or about March 13, 1996, NML requested an Attending Physician's Statement from Dr. Chiles. A one page report from Dr. Chiles was received on April 8, 1996, three days after the death of Mr. Craner, to the effect that Dr. Chiles had seen Mr. Craner over two periods of time, the first period being a couple of years ago and the second for the past three months. Dr. Chiles stated that the first period dealt with issues of the bankruptcy and feelings of Mr. Craner about unfairness and discouragement. Dr. Chiles stated that the last period of time dealt with the death of his son Kent. Because the information contained in the report was so limited, Patricia Valoe, the Regional Underwriting Consultant for the Western Region of NML, contacted Dr. Chiles by phone and requested his notes from two years ago and from December 1995 to the present, together with summaries of the notes. There was delay in providing the information, but it was faxed to NML on the weekend of May 3, 1996, reviewed on May 6, 1998. These materials revealed that on November 2, 1995, Mr. Craner had been arrested and charged with three first degree felony counts, including rape of a child, sodomy of a child, and aggravated sexual abuse of a child. He had pled not guilty and the matter was set for pretrial on April 9, 1996. NML further learned from the notes that Mr. Craner had faced previous charges of sexual deviance with an eight-year-old girl, and that on November 21, 1991, he had pled guilty to a charge of lewdness with a child. His guilty plea was received and a conviction was entered. The psychologist's notes concerning Mr. Craner's visit with Dr. Chiles on 12/19/95 state that Mr. Craner "believes his lawyer is overly optimistic—Believes he will serve time—..." NML thereafter obtained court records which confirmed the aforesaid sexual activities of Mr. Craner with children. NML also learned that Mr. Craner had been involved in an extra-marital affair.

Mr. Craner died in a single-car automobile crash on April 5, 1996, four days prior to the date which had been set for his pretrial in the pending criminal case.

Plaintiff has set forth certain "Evidentiary Objections" to some of the factual matters set forth above. These objections are overruled. In large part the objections are based upon plaintiff's conception that a binding contract was formed when the application was signed and the first premium paid, and that information obtained after the date of death was irrelevant. This is a matter later discussed and rejected. The principal evidentiary objections are:

*Answers to Medical Questionnaire*

■ Plaintiff asserts, based on conversations Mrs. Craner allegedly had with Mr. Craner, that the following part of Question 36(a) which particularizes as to "other health care providers," was not asked of the decedent Stephen Craner:

"... (medical doctor, psychiatrist, psychologist, osteopath, chiropractor, counselor, therapist or other)?"

The assertions and belief of Mrs. Craner constitute inadmissible hearsay. More importantly, however, this court regards the answer given by decedent, after reading and certifying that the answer had been "correctly recorded, complete and true," to be responsive to the whole question including the part in parentheses quoted above. The answer as given is conclusively binding. The Tenth Circuit has so ruled:

[W]here an applicant gives verbal responses to an insurer's agent, who then fills out the application, the applicant has a duty to

read the application before signing it and make certain his verbal responses have been correctly recorded, and that in the absence of fraud, accident, misrepresentation, imposition, illiteracy, artifice or device ... *the applicant, by his act of signing the application, 'is, by law, conclusively presumed to have read the application and his beneficiary is bound by the contents thereof.'*

*Jones v. New York Life & Annuity Corp.,* 985 F.2d 503, 508 (10th Cir.1993) (emphasis added). *See also Mofrad v. New York Life Ins. Co.,* 206 F.2d 491, 493 (10th Cir.1953); *Machinery Center, Inc. v. Anchor Nat'l Life Ins. Co.,* 434 F.2d 1, 4 (10th Cir.1970).

*Answers and Information Obtained in Response to Telephone Interview*

■ Following the telephone interview with Mr. Craner on March 8, 1996, in which plaintiff provided the name of his psychologist, defendant requested and in early May 1996 received the psychologist's notations. These revealed for the first time the existence of a prior criminal conviction, pending criminal charges and depression related thereto. Defendant then obtained copies of court records to verify the criminal matters. The materials came into the possession of defendant well after the insurance application was signed on February 28, 1996, and after the date of death April 5, 1996. Plaintiff claims that such are irrelevant and constitute inadmissible hearsay. This court holds that the materials constituted a part of the information NML was entitled to receive and did receive in order to make its determination whether the "proposed insured" (Mr. Craner) was "risk acceptable." Since the psychologist's notes and the court records constitute a critical part of the information upon which that determination was made and upon which NML relied, the hearsay rule does not apply. In addition, the materials appear to qualify as an exception to the hearsay rule as business records. The information is not irrelevant because it bears upon whether NML's determination that Mr. Craner was not an "acceptable risk" was arbitrary and capricious. In all events, at least as to what the non moving parties rely upon in opposition to summary judgment, the content or substance of the evidence as distinguished from its form would be deemed admissible. *See Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995).

Based on information obtained, including particularly Mr. Craner's psychological history, misdemeanor conviction, and pending criminal charges, on May 14, 1996, NML declined Mr. Craner's insurance application, deeming him to be an unacceptable risk as of the Underwriting Date—February 28, 1996. NML's determination that he was not an acceptable insurance risk was based on its underwriting standards, policies, procedures, and philosophy.[1]

## ANALYSIS

### I. CONTRACTUAL CLAIM FOR LIFE INSURANCE COVERAGE

The fundamental issue before this court which is presented in both cross motions for

---

1. Under the general heading "Depression," NML's Underwriting Manual provides:

> The most common cause is *reaction to a major life adversity,* such as the loss of a loved one, being fired from a job, contracting a serious or disabling illness, etc.... The predominating mortality risk is suicide. Fifteen percent (15%) of deaths among depressed patients are due to suicide. The risk is greatest in severe reactive depression, during or immediately following exacerbations of depressive neurosis and *at all times during psychotic depression.* (Emphasis added.)

The Underwriting Manual lists rape as a high risk crime, and provides:

> Mortality and morbidity experience for persons with criminal and civil litigation records is limited, but it is known that *those who continue to pursue illegal activities are more likely to suffer injury, violent death* or be confined in prison. (Emphasis added.)

Under the guidelines in the Underwriting Manual, Mr. Craner would not have been an acceptable risk on the Underwriting Date, February 28, 1998, because of his history of psychological problems, coupled with his criminal conviction and pending charges. In this regard, Jean Maier, an officer of NML, submitted this explanation in a letter dated June 2, 1996:

> In summary, our determination on Mr. Craner's application was based on the increased mortality risks associated with the stress of pending criminal charges, and the potential psychological and environmental (e.g.prison) risks associated with the consequences of repetitive criminal behavior.

(Defendant's Memorandum in Support of Motion for Summary Judgment. Exhibit N.)

summary judgment is whether under the facts of this case, and the law of the State of Utah, the "Conditional Life Insurance Agreement" provided binding temporary insurance coverage which was in effect at the time of Mr. Craner's death. Defendant argues under the plain terms of the conditional agreement that no insurance coverage was ever in force because NML properly determined that as of February 28, 1996, the date the application was signed and first premium paid, the proposed insured was not an acceptable risk and that a favorable determination in that regard constituted a condition precedent to insurance coverage. Plaintiff argues that a binding agreement came into being on the application date, subject only to a condition subsequent which would have enabled NML to disavow the coverage prior to the date of death. Plaintiff also argues that in any event the conditional agreement was ambiguous, thus precluding an award of summary judgment.

### A. *The Conditional Life Insurance Agreement is Not Ambiguous*

■ The NML insurance application is governed by general rules of contract interpretation. Contract construction, including whether a document is ambiguous or unambiguous, is a matter of law. In this regard, the Supreme Court of Utah in *Williams v. First Colony Life Insurance Co.*, 593 P.2d 534, 536 (Utah 1979), stated:

> [I]n determining the intent of a contract the language of the instrument itself should first be looked to, and unless there is some ambiguity or uncertainty, there is no justification for attempting to vary it by extrinsic or parole evidence.

Thus, a contract that is unambiguous should be enforced as written, and only when the contract terms are ambiguous should insurance contracts be construed in favor of the insured. The Tenth Circuit so ruled in *Hartford Acc. & Indem. Co. v. U.S. Fidelity & Guaranty Co.*, 962 F.2d 1484 (10th Cir.1992), affirming 765 F.Supp. 677 (D.Utah 1991), *cert. denied*, 506 U.S. 955, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992):

> When an insurance policy is equivocal, it must be interpreted in favor of the insured. In the absence of ambiguity, however, 'an unambiguous insurance contract,

like any other contract, should be enforced as written.' ... We accord insurance terms their ordinary usage and connotations, being 'obliged to assume that language included therein was put there for a purpose, and to give it effect where its meaning is clear and unambiguous.'

962 F.2d at 1486–87. An applicant for insurance, having signed the application, is deemed to have read it and is bound by the contents thereof. *Jones v. New York Life & Annuity Corp.*, 985 F.2d 503, 508 (10th Cir. 1993).

In the judgment of this court, the language of the Agreement is not ambiguous. Its meaning is clearly capable of determination from the document itself.

### B. *The Conditional Life Insurance Agreement Contains a Condition Precedent Which Requires Determination of Acceptable Risk*

■ Neither NML's Conditional Life Insurance Agreement nor the Receipt it issued for payment of his first premium created a binding temporary life insurance policy during the pendency of NML's determination of whether Mr. Craner was an acceptable insurance risk. This is so because the parties' intention was clearly manifest in plain language that such determination had to be made before any insurance would be in force. This established a condition precedent to coverage that NML determine Craner to be an acceptable insurable risk based upon an investigation of pertinent facts as of the Underwriting date. NML conducted such an investigation and determined that Mr. Craner was not an acceptable insurance risk. In *Williams v. First Colony Life Ins. Co.*, the Supreme Court of Utah recognized and approved such conditions in insurance contracts:

> By the same measure of justice which decrees that it is unfair for an insurer to charge premiums which purport to cover a period when in fact no such coverage exists, *the insurer should be accorded the protection of the plainly stated provisions of its contract as to the conditions prerequisite to its providing insurance coverage.* In harmony with this, we have quoted with

approval the proposition that: ... if, at the time of the application or medical examination, the insured was an insurable risk, the temporary contract of insurance is in force. *If, however, the applicant at the time of the application or the medical examination was not an insurable risk, the company will not be liable under the 'binding receipt.'* The rationale behind this holding is simply that the language of the receipt clearly expresses the intention of the parties. 593 P.2d 534, 537 (Utah 1979) (emphasis added).

The court concluded in *Williams* that as long as the conditions set forth in the insurance agreement were "clearly stated, they became part of the contract so that insurance coverage would not begin until those conditions were met." *Id.*

Prior to the *Williams* case, the Utah high court decided a case relied upon by plaintiff involving what was described as a "binding or conditional receipt." *Long v. United Benefit Life Ins. Co.,* 507 P.2d 375, 29 Utah 2d 204 (1973). That case is inapposite because it did not involve a conditional receipt in which the parties clearly agreed that approval of a proposed insured as an acceptable risk by the insurance company would have to occur before insurance was in force, and it was decided before a Utah statute was enacted which clarified any confusion that may have existed.[2] The statute in question defines and clarifies the difference between "conditional receipts" which do not create temporary insurance, and "binders" which do create such:

§ 31A–21–102 **Oral contracts of insurance and binders.**

(1) "Binder" means a writing which describes the subject and amount of insurance and temporarily binds insurance coverage pending the issuance of an insurance policy. *"Binder" does not include conditional receipts by life insurance companies under which issuance of the policy or coverage under the policy is contingent upon the acceptability of the risk to the insurer.*

Utah Code Ann. § 31A–21–102 (1995) (emphasis added). In the case at bar, the court finds and rules that the receipt which was issued in connection with the "Conditional Life Insurance Agreement" clearly qualifies as a "conditional receipt" rather than a "binder" within the meaning of the statute.

Plaintiff also relies on a case decided by the Utah Court of Appeals, *Stevenson v. First Colony Life Ins. Co.,* 827 P.2d 973 (Utah App.1992), *cert. denied,* 843 P.2d 1042. Although that case was decided after the aforesaid Utah statute was enacted, it makes no reference to the statute and the important definitions set forth therein. Moreover, the opinion does not identify the terms of the ·document involved, providing no basis upon which to determine the applicability or non applicability of the statutory definitions to that particular agreement. In all events, this court regards the case as non-binding in the circumstances of the case at bar in view of· *Williams,* supra, and Utah Code Ann. § 31A–21–102.

C. *The Determination of Unacceptable Insurance Risk Was Not Arbitrary and Capricious*

Under Section I of the Conditional Insurance Agreement, whether the proposed insured "is not a risk acceptable" to NML is determined "according to its rules and standards." This establishes an objective standard of measurement for determination of acceptable risks as of the Underwriting Date, which the parties agree was

---

**2.** In *Long,* the document involved was labeled "receipt" rather than "conditional receipt." The court construed the application in that case as subject to a condition subsequent which had to be exercised before the date of death. The court seemed to equate "binding" receipts with "conditional" receipts, stating that "[t]o alleviate [insurance company losses] the companies initiated the practice of issuing binding or conditional receipts, which usually contained a provision to the effect that the insurance should be considered as in force from the date of the receipt, or

the date of the medical examination, provided that the application was approved and accepted at the home office of the insurer." 507 P.2d at 377. The *Williams* court distinguished the non binding conditional receipt in that case from prior cases which had dealt with binding receipts. The court said: "For a discussion of the purpose of so-called 'binding receipts' and how courts have interpreted them, see *Prince [v. Western Empire Life Ins. Co., 19 Utah 2d 174, 428 P.2d 163 (1967)]* ... and *Long".* 593 P.2d at 537, n.4.

February 28, 1996. That determination can be measured after the death of a proposed insured, based upon all relevant facts which existed on the Underwriting Date. However, the decision must not be arbitrary or capricious, and must be based upon and measured by objective standards, such as rules and standards set forth in NML's Underwriting Manual. A well known and widely quoted Insurance Treatise sets forth the applicable rule of law thusly:

> An insurer's decision to reject an applicant on the basis that he or she is uninsurable must be made in good faith. Good faith can be proved with evidence that the decision was made in accordance with standard underwriting practices. Such proof may consist of the company's underwriting manual, testimony of company officials, [or] the applicant's medical history.... If the insured dies prior to the company making a decision, the burden of proof is on the beneficiary to show that the decedent met the objective test of insurability according to the general standards of the industry ... [or] of its own objective standard, if different from general standards.

Couch on Insurance 3d, § 13:14 13–38 to 13–39 (1995).

This court holds as a matter of law that defendant NML's determination that the decedent was an unacceptable insurance risk on the Underwriting Date was not arbitrary or capricious. Further, plaintiff has failed to carry the burden of showing that decedent was insurable as of that date, or that NML's decision was arbitrary or capricious, or that the decision was made in bad faith.

Based upon the foregoing, defendant's Motion for Summary Judgment on the contract claim is GRANTED,[3] and plaintiff's Motion for Summary Judgment on that claim is DENIED.

---

**3.** Defendant's affirmative defenses based on alleged misrepresentation and suicide need not be addressed and no opinion is here expressed as to the merits of those defenses.

**4.** It is axiomatic that an implied term cannot contradict an express contract term. *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1044 (Utah 1989). In this regard, the implied covenant of good faith and fair dealing may not be construed to imply "new, independent rights or duties not agreed upon by the parties." *Brehany v. Nord-*

## II. OTHER CLAIMS OF LIABILITY

Other claims for relief asserted in this diversity action are Breach of Implied Covenant of Good Faith and Fair Dealing, Fraudulent Inducement, Infliction of Severe Emotional Distress and Negligent Delay. These claims will be discussed seriatim.

### A. *Breach of Implied Covenant of Good Faith and Fair Dealing*

■■■■■ Insurance contracts, like other contracts, contain an implied obligation of good faith performance. *Beck v. Farmers Insurance Exchange,* 701 P.2d 795, 801 (Utah 1985). The Utah Supreme Court held in *Beck* that this obligation contemplates that the insurer "will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Id.* In the case at bar, Mr. Craner bargained for purchase of a $500,000.00 life insurance policy, but subject to the condition that no insurance would be in force if NML by conducting an investigation should determine him not to be an acceptable risk according to its rules and standards. Plaintiff contends that NML is liable under *Beck* because "declination of coverage after Craner's death was in bad faith and not fairly debatable as a matter of law." (Complaint paragraph 18.) That contention fails, however, because the bargained for condition precedent to coverage did not occur and there was no breach of contract by NML. The fact that declination of coverage occurred after the date of death and was based upon information which was not discovered until after the date of death does not ipso facto constitute bad faith. Most importantly, where there is no breach of an express covenant in a contract, there can be no cause of action for breach of an implied covenant arising therefrom.[4] Based on the

---

*strom,* 812 P.2d 49, 55 (Utah 1991). Instead, these terms are implied in contracts in order "to protect the express covenants or promises of the contract...." *Peterson v. Browning,* 832 P.2d 1280, 1284 (Utah 1992) (quoting *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 394 (1988)). Therefore, if there is no express covenant or promise then there can be no implied covenant or promise to do the same. *Seare v. University of Utah School of Medicine,* 882 P.2d 673, 678–79 (Utah App.1994).

foregoing, defendant's motion for Summary Judgment on the Implied Covenant of Good Faith and Fair Dealing cause of action is GRANTED, and plaintiff's motion for Summary Judgment on the Implied Covenant of Good Faith and Fair Dealing is DENIED.

### B. *Fraudulent Inducement*

In Utah, the following elements are required to sustain a claim of fraud: (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he [or she] had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his [or her] injury and damage. *Maynard v. Wharton*, 912 P.2d 446 (Utah App.1996); *See also Dugan v. Jones*, 615 P.2d 1239, 1246 (Utah 1980). In support of her claim of fraudulent inducement, plaintiff alleges essentially the same facts as in her contract claim, including particularly that NML did not appropriately evaluate Mr. Craner's application, that the application was declined solely because Mr. Craner died prior to the policy going into effect, and that NML's agent did not explain the medical investigation process to Mr. Craner. These allegations are the graveman of the contract claim, and are subsumed by the ruling herein that no breach of contract occurred. The elements of fraud apart from breach of contract have not been shown to exist. The matters alleged sound in contract, not fraud, and such are not actionable. Accordingly, defendants' motion for Summary Judgment on the fraudulent inducement claim is GRANTED, and plaintiff's motion for Summary Judgment on the fraudulent inducement claim is DENIED.

### C. *Intentional Infliction of Emotional Distress*

Utah law requires a showing of three elements to support a claim of intentional infliction of emotional distress: (1) that the defendant intentionally engaged in some conduct toward the plaintiff considered "outrageous and intolerable" in that it offends generally accepted standards of decency and morality (2) with the purpose of inflicting emotional distress or where any reasonable person would have known that such would result, and (3) that severe emotional distress resulted as a direct result of the defendant's conduct. *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896 (Utah 1992); *See also Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344 (1961). Utah courts require such conduct to be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *White v. Blackburn*, 787 P.2d 1315, 1317 (Utah Ct.App.1990), *quoting, Davidson v. City of Westminster*, 32 Cal.3d 197, 185 Cal.Rptr. 252, 649 P.2d 894, 901 (1982). Nothing presented by plaintiff rises to the required "outrageous and intolerable" standard. Therefore, defendant's Summary Judgment on the intentional infliction of emotional distress claim is GRANTED, and plaintiff's motion for Summary Judgment on that claim is DENIED.

### D. *Negligent Delay*

Plaintiff's negligent delay claim is based on the following allegation:

NML's failure to have processed the Offer and issue the Policy prior to the date of death of Craner was due exclusively to the negligent delay of NML in processing the Offer in accordance with standard underwriting practices regularly employed. (Complaint paragraph 32.)

First, it is doubtful that Utah law would extend negligent delay claims to insurance contracts in the context presented in the case at bar. At this juncture, it appears that Utah case law has allowed a negligent delay cause of action only in the context of medical malpractice, in which a hospital or doctor is sued for "negligent delay" in diagnosing a terminal illness. In this regard, in *George v. LDS Hosp.*, 797 P.2d 1117, 1121 (Utah App.1990) the Utah Court of Appeals held that evidence establishing negligent delay in diagnosis or treatment which ultimately increased the need for or lessened the effectiveness of treatment may constitute the basis for a wrongful death cause of action. Whether negligent delay in the context presented in this case would be recognized by

the Supreme Court of Utah as constituting a separate cause of action such as may be asserted in the medical malpractice context is problematical.

More importantly, assuming without deciding that the tort of negligent delay would be recognized by the Utah court, it appears that the cause of action asserted here is really based on alleged breach of contract, which is subsumed by the ruling of this court that there was no breach. Moreover, the delay which occurred in this case was not unreasonable as a matter of law. The investigation by NML was conducted within a reasonable period of time under the circumstances presented. The proposed insured agreed in writing that information about him could be obtained and disclosed for a substantial period of time (30 months) after the insurance application was signed, but NML's investigation of such information initially was delayed because of Mr. Craner's failure to provide correct information in his insurance application. NML's investigation was further delayed by Dr. Chiles' failure timely to produce relevant medical records of his treatments of Mr. Craner. (Insurance Application pg. 15; Valoe Declaration paragraphs 6 – 12.) Notwithstanding these delays, this court does not regard the period of time taken to process the insurance application to be unreasonable. To the extent that there was delay it is manifest that Mr. Craner and Dr. Chiles substantially contributed thereto. Therefore, defendants' motion for Summary Judgment on the negligent delay claim is GRANTED, and plaintiff's motion for Summary Judgment on that claim is DENIED.

For the reasons set forth herein, defendant's Motion for Summary Judgment on all claims is GRANTED.

Counsel for defendant should prepare and lodge with the court within 15 days after receipt of this opinion a form of judgment consistent with this Memorandum Decision and Order, after first complying with local rule 54–1(b).

IT IS SO ORDERED.